CLARK ET AL. *v.* ROEMER, GOVERNOR OF LOUISI-
ANA, ET AL.

No. 90–952.   Argued April 22, 1991—Decided June 3, 1991

KENNEDY, J., delivered the opinion for a unanimous Court.

*Robert B. McDuff* argued the cause for appellants. With him on the briefs were *Frank R. Parker, Brenda Wright, Ernest L. Johnson,* and *Ulysses Gene Thibodeaux.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Clegg,* and *Jessica Dunsay Silver.*

*Robert G. Pugh, Jr.,* argued the cause for appellees. With him on the brief were *Robert G. Pugh, John N. Kennedy, Thomas A. Casey, Michael H. Rubin, Christina B. Peck,* and *Cynthia Young Rougeou.**

JUSTICE KENNEDY delivered the opinion of the Court.

This case raises two issues under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c.

I

The Voting Rights Act of 1965, 42 U. S. C. § 1973 *et seq.,* contains two major provisions governing discrimination in election practices. Section 2 addresses existing election procedures. It prohibits procedures that "resul[t] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." § 1973(a). Section 5 governs changes in voting procedures. In order to prevent changes that have a discriminatory purpose or effect, § 5 requires covered jurisdictions, such as Louisiana, to obtain preclearance by one of two methods before implementing new voting practices. § 1973c. Through judicial preclearance, a covered jurisdiction may obtain from the United States District Court for the District of Columbia a declaratory judgment that the voting change "does not have the purpose and

---

*\*Kathleen L. Wilde, Laughlin McDonald,* and *Neil Bradley* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

will not have the effect of denying or abridging the right to vote on account of race or color." *Ibid.* Through administrative preclearance, the jurisdiction may submit the change to the Attorney General of the United States. If the Attorney General "has not interposed an objection within sixty days after such submission," the State may enforce the change. *Ibid.*

Appellants are black registered voters and a voting rights organization in Louisiana. They filed this suit in 1986 under §§ 2 and 5 of the Voting Rights Act of 1965, challenging the validity of Louisiana's multimember, at-large electoral scheme for certain appellate, district, and family court judges. Under § 2, appellants alleged that Louisiana's electoral scheme diluted minority voting strength. In an amended complaint filed in July 1987, appellants also alleged that Louisiana violated § 5 by failing to submit for preclearance a number of statutory and constitutional voting changes, many of them adopted in the late 1960's and 1970's. The § 2 portion of the case was assigned to a single District Court Judge; the § 5 allegations were heard by a three-judge District Court, 42 U. S. C. § 1973c; 28 U. S. C. § 2284.

In response to the appellants' § 5 allegations, Louisiana submitted all of the unprecleared voting changes for administrative preclearance. In September 1988 and May 1989, the Attorney General granted preclearance for some of the changes, but objected to others. On June 18 and 20, 1990, Louisiana asked the Attorney General to reconsider his denial of preclearance for these seats, and proceeded with plans to hold elections for them in the fall of 1990. On July 23, 1990, appellants filed a motion asking the three-judge District Court to enjoin the elections for the unprecleared seats.

On July 6, 1990, the District Court presiding over the § 2 case enjoined the State from holding elections in 11 judicial districts which it determined violated § 2. Some of these judicial districts were also at issue in the § 5 portion of the case. On September 28, 1990, the three-judge District Court pre-

siding over the § 5 case denied appellants' motion to enjoin the State from holding elections for the seats not blocked by the § 2 injunction. The three-judge panel, however, did enjoin the winning candidates from taking office pending its further orders.

Also on September 28, 1990, the United States Court of Appeals for the Fifth Circuit, sitting en banc, held that judges are not representatives for purposes of § 2 of the Voting Rights Act. *League of United Latin American Citizens Council No. 4434* v. *Clements*, 914 F. 2d 620 (1990), cert. granted, 498 U. S. 1061 (1991). Based on this precedent, the District Court Judge presiding over the § 2 aspect of the case dissolved the § 2 injunction on October 2 and ordered that elections for the 11 districts be held on November 6 and December 8, 1990. On the same day, the three-judge District Court presiding over the § 5 case refused to enjoin the elections for the unprecleared seats, but it again enjoined the winning candidates from taking office pending its further orders. As of October 2, 1990, then, Louisiana had scheduled elections for all of the judgeships to which the Attorney General had interposed objections.

In an October 22 order and an October 31 opinion, the three-judge District Court made its final pronouncement on the status of the unprecleared judgeships. The court divided the unprecleared electoral changes into two categories. Category one involved at-large judgeships in districts where, for the most part, the State had obtained administrative preclearance for later created judgeships. The three-judge District Court held that, despite his current objections, the Attorney General had precleared the earlier judgeships when he precleared the later, or related, voting changes. For example, the First Judicial District Court in Caddo Parish has a number of judgeships, called Divisions, subject to § 5. Louisiana submitted and obtained approval for Divisions E (created in 1966, precleared in 1986), G (created and precleared in 1976), H (created and precleared in 1978), and I (created

and precleared in 1982). Division F was not submitted for approval when it was created in 1973; rather, it was submitted and objected to in 1988. The three-judge District Court held, however, that when the Attorney General precleared Divisions G, H, and I, he also precleared Division F. The court reasoned that because the legislation creating Divisions G, H, and I added to the number of prior judgeships in Caddo Parish, including Division F, approval of the legislation constituted approval of Division F. 751 F. Supp. 586, 592, and n. 35 (MD La. 1990).

Category two under the court's ruling involved judgeships subject to valid objections by the Attorney General. Yet despite its holding that these unprecleared judgeships violated § 5, the court refused to enjoin the elections. It found "the potential harm to all of the citizens of Louisiana [from such an injunction] outweigh[ed] the potential harm, if any, of allowing the elections to continue." *Id.*, at 595. It allowed the election to proceed under the following conditions. The winning candidates could take office if, within 90 days, Louisiana filed a judicial preclearance action in the United States District Court for the District of Columbia or persuaded the Attorney General to withdraw his objections. The winners of the election could remain in office pending judicial preclearance and could retain office for the remainder of their terms if the State obtained judicial preclearance. If the State failed to obtain judicial preclearance, the installed candidates could remain in office only 150 days after final judgment by the District Court.

On October 29, 1990, appellants filed an emergency application in this Court to enjoin the November 6 and December 8 elections pending appeal. On November 2, we granted the application in part and enjoined the elections for the judgeships that the District Court conceded were uncleared. *Clark* v. *Roemer*, 498 U. S. 953, modified, 498 U. S. 954 (1990). We did not overturn the District Court's refusal to

enjoin elections for the judgeships that it considered pre-cleared by implication. *Ibid.*

On January 18, 1991, we noted probable jurisdiction. 498 U. S. 1060. The next day, the State sought judicial pre-clearance for the electoral changes that the three-judge District Court found to be uncleared. That action is still pending in the United States District Court for the District of Columbia.

## II

The case presents two discrete issues under § 5 of the Voting Rights Act. First, we must decide whether the District Court erred by not enjoining elections held for judgeships to which the Attorney General interposed valid § 5 objections. Second, we must determine whether the State's failure to preclear certain earlier voting changes under § 5 was cured by the Attorney General's preclearance of later, or related, voting changes.

## A

The District Court held that the Attorney General had interposed valid objections to some judgeships. Nonetheless, it permitted elections for those seats to go forward and allowed the winners to take office pending resolution of Louisiana's judicial preclearance request. This ruling was error.

Section 5 requires States to obtain either judicial or administrative preclearance before implementing a voting change. A voting change in a covered jurisdiction "will not be effective as la[w] until and unless .cleared" pursuant to one of these two methods. *Connor* v. *Waller*, 421 U. S. 656 (1975) *(per curiam)*. See also *United States* v. *Board of Supervisors of Warren County*, 429 U. S. 642, 645 (1977) ("No new voting practice or procedure may be enforced unless the State or political subdivision has succeeded in its declaratory judgment action or the Attorney General has declined to object"). Failure to obtain either judicial or administrative preclearance "renders the change unenforceable." *Hathorn* v. *Lovorn*, 457 U. S. 255, 269 (1982). If voting changes sub-

ject to § 5 have not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting the State from implementing the changes. *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 572 (1969).

The District Court ignored these principles altogether. It presented a number of reasons for not enjoining the election, none of which we find persuasive. The court cited the short time between election day and the most recent request for injunction, the fact that qualifying and absentee voting had begun, and the time and expense of the candidates. But the parties, the District Court, and the candidates had been on notice of the alleged § 5 violations since appellants filed their July 1987 amended complaint. When Louisiana asked the Attorney General for reconsideration of its original preclearance decision in June 1990, it became apparent that the State intended to hold elections for the unprecleared seats in the fall of the same year. Less than a month later, and more than two months before the scheduled October 6, 1990, election, appellants filed a motion to enjoin elections for the unprecleared seats. Appellants displayed no lack of diligence in challenging elections for the unprecleared seats, and every participant in the process knew for over three years that the challenged seats were unprecleared, in violation of § 5.

The other reasons for the District Court's decision lack merit as well. The District Court maintained that the applicability of § 5 to judges was uncertain until our summary affirmance in *Brooks* v. *Georgia State Bd. of Elections*, 775 F. Supp. 1470, aff'd, 498 U. S. 916 (1990). But in *Haith* v. *Martin*, 618 F. Supp. 410 (EDNC 1985), aff'd, 477 U. S. 901 (1986), we issued a summary affirmance of a decision holding that § 5 applied to judges. Nor did the District Court's vague concerns about voter confusion and low voter turnout in a special election for the unprecleared seats justify its refusal to enjoin the illegal elections. Voters may be more confused and inclined to avoid the polls when an election is held

in conceded violation of federal law. Finally, the District Court's stated purpose to avoid possible challenges to criminal and civil judgments does not justify allowing the invalid elections to take place. To the contrary, this concern counsels in favor of enjoining the illegal elections, thus averting a federal challenge to state judgments.

The three-judge District Court, 751 F. Supp., at 595, maintained that its decision to give provisional effect to elections conducted in violation of § 5 "closely parallel[ed]" a number of our decisions, including *Perkins* v. *Matthews*, 400 U. S. 379 (1971), *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166 (1985), *Berry* v. *Doles*, 438 U. S. 190 (1978), and *Georgia* v. *United States*, 411 U. S. 526 (1973). The cases are inapposite. *Perkins* stated that "[i]n certain circumstances . . . it might be appropriate to enter an order affording local officials an opportunity to seek federal approval and ordering a new election only if local officials fail to do so or if the required federal approval is not forthcoming." 400 U. S., at 396–397. But in *Perkins*, as in *Hampton County*, *Berry*, and *Georgia*, the elections in question had been held already; the only issue was whether to remove the elected individuals pending preclearance. Here the District Court did not face the *ex post* question whether to set aside illegal elections; rather, it faced the *ex ante* question whether to allow illegal elections to be held at all. On these premises, § 5's prohibition against implementation of unprecleared changes required the District Court to enjoin the election. This is especially true because, unlike the circumstance in *Perkins*, *Hampton County*, *Berry*, or *Georgia*, the Attorney General interposed objections before the election.

We need not decide today whether there are cases in which a district court may deny a § 5 plaintiff's motion for injunction and allow an election for an unprecleared seat to go forward. An extreme circumstance might be present if a seat's unprecleared status is not drawn to the attention of the State until the eve of the election and there are equitable principles

that justify allowing the election to proceed. No such exigency exists here. The State of Louisiana failed to preclear these judgeships as required by § 5. It received official notice of the defect in July 1987, and yet three years later it had still failed to file for judicial preclearance, the "basic mechanism" for preclearance, *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110, 136 (1978). It scheduled elections for the unprecleared seats in the fall of 1990 even after the Attorney General had interposed objections under § 5. In short, by the fall 1990 election, Louisiana had with consistency ignored the mandate of § 5. The District Court should have enjoined the elections.

## B

The District Court held also that the Attorney General's preclearance of voting change legislation in some districts operated to preclear earlier voting changes in those districts, even though the Attorney General now objects to the earlier changes. This ruling conflicts with our decision in *McCain* v. *Lybrand*, 465 U. S. 236 (1984), and subverts the efficacy of administrative preclearance under § 5.

*McCain* involved a 1966 South Carolina statute establishing a three-member county council elected at large by all county voters and requiring candidates to reside in, and run from, one of three residency districts. The State failed to preclear the 1966 statute. In 1971, the State amended the statute to increase the number of residency districts and county council members from three to five, and submitted the new Act for preclearance. Based on a request by the Attorney General for additional information, South Carolina also submitted a copy of the 1966 Act. The Attorney General declined to interpose any objection "to the change in question." *Id.*, at 241. In a later § 5 challenge to the 1966 changes, a District Court held that the Attorney General's request for additional information indicated that he considered and approved all aspects of the electoral scheme subject

to the 1971 amendments, including the changes effected by the 1966 Act. In the alternative, the District Court held that since the 1971 amendment retained or incorporated changes effected by the 1966 Act, the lack of objection to the 1971 submission constituted approval of the 1966 Act.

We reversed both holdings. We made clear that the submission of legislation for administrative preclearance under § 5 defines the scope of the preclearance request. Under normal circumstances, a submission pertains only to identified changes in that legislation. *Id.*, at 251, 257. We established also that any ambiguity in the scope of a preclearance request must be resolved against the submitting authority. *Id.*, at 257. Applying these standards, we held that the three-judge District Court's finding that the Attorney General had considered and approved the changes made by the 1966 Act in the course of approving the 1971 amendment was clearly erroneous, because the information submitted was limited to election changes effected by the 1971 amendments.

We held further that the District Court erred as a matter of law in determining that approval of the 1971 submission was also an approval of the changes in the 1966 statute. We explained that "the preclearance procedures mandated by § 5 . . . focus entirely on *changes* in election practices," *id.*, at 251, and that "submission of a particular change does not encompass all prior changes—precleared or not—that have been made since the Act's effective date . . . ," *id.*, at 255, n. 26.

> "When a jurisdiction adopts legislation that makes clearly defined changes in its election practices, sending that legislation to the Attorney General merely with a general request for preclearance pursuant to § 5 constitutes a submission of the changes made by the enactment and cannot be deemed a submission of changes made by previous legislation which themselves were independently subject to § 5 preclearance." *Id.*, at 256.

The three-judge District Court in the instant case reasoned as follows in ruling that submission and approval of the later electoral changes constituted submission and approval of the earlier changes:

"[W]e find that there was express approval by the Attorney General for those judicial positions set forth in Part I of our October 22, 1990, order. The language of the various acts submitted to the Attorney General, as well as the letters submitted by the State of Louisiana seeking preclearance, support this conclusion. Thus, the change submitted to the Attorney General is not only the Amendment, but the entire act as passed by the legislature. When the Attorney General approves the new act, he not only approves the amended portion but necessarily approves the older, reenacted part, which forms part of the new act. Thus, when an act provides for a certain number of judicial positions, approval of that act must include all of the judicial positions necessary to reach that number." 751 F. Supp., at 592–593 (footnotes omitted).

And in a footnote, the court explained that the submission of the later Acts covered the earlier Acts as well because "in most cases the letter of submission clearly and expressly states that the number of judges in a particular district is being increased from one number to another." *Id.*, at 592–593, n. 38. On this basis alone, the District Court distinguished *McCain.* 751 F. Supp., at 592–593, n. 38.

The District Court's explanation for its holding replicates the precise factual and legal errors we identified in *McCain.* Its ruling that preclearance "not only approves the amended portion of the new act but necessarily approves the older, reenacted part, which forms part of the new act" is inconsistent with *McCain. McCain* establishes a presumption that the Attorney General will review only the current changes in election practices effected by the submitted legislation, not prior uncleared changes reenacted in the amended legisla-

tion. A submission's description of the change from one number of judges to another in a particular judicial district does not, by itself, constitute a submission to the Attorney General of the prior voting changes incorporated in the newly amended statute. "A request for preclearance of certain identified changes in election practices which fails to identify other practices as new ones thus cannot be considered an adequate submission of the latter practices." 465 U. S., at 256–257. Of course, a State may include earlier unprecleared changes as a specific submission along with its preclearance request for contemporary legislation. But it must identify with specificity each change that it wishes the Attorney General to consider.

The requirement that the State identify each change is necessary if the Attorney General is to perform his preclearance duties under § 5. The Attorney General has substantial responsibilities under § 5. The Government represents to us that the Attorney General reviews an average of 17,000 electoral changes each year, and that within the 60-day preclearance period, he must for each change analyze demographics, voting patterns, and other local conditions to make the statutory judgment concerning the presence of a discriminatory purpose or effect. Brief for United States as *Amicus Curiae* 22, n. 18. Congress recognized that the Attorney General could not, in addition to these duties, also monitor and identify each voting change in each jurisdiction subject to § 5. "[B]ecause of the acknowledged and anticipated inability of the Justice Department — given limited resources — to investigate independently all changes with respect to voting enacted by States and subdivisions covered by the Act," 465 U. S., at 247, Congress required each jurisdiction subject to § 5, as a condition to implementation of a voting change subject to the Act, to identify, submit, and receive approval for all such changes. The District Court's holding upsets this ordering of responsibilities under § 5, for it would add to the Attorney General's already redoubtable obligations the additional duty

to research each submission to ensure that all earlier un-submitted changes had been brought to light. Such a rule would diminish covered jurisdictions' responsibilities for self-monitoring under § 5 and would create incentives for them to forgo the submission process altogether. We reaffirm *McCain* in rejecting this vision of § 5.

In light of its legal errors, the District Court's finding that the Attorney General "expressly approved" the prior un-cleared changes cannot stand. Neither the initial submission nor the Attorney General's ruling upon it can be deemed to include the earlier unprecleared seats. Louisiana's submissions of contemporary legislation to the Attorney General failed as a matter of law to put him on notice that the prior unsubmitted changes were included. None of the submissions informed the Attorney General that prior voting changes were uncleared and were being transmitted along with the new changes. In most instances, Louisiana submitted only the legislation containing the new voting change. The record contains five submission letters, but these communications do not give requisite notice. Two were mere cover letters that added nothing to the submitted legislation. The other three letters note changes in the number of judges in a district, but as we have explained, this alone does not constitute a submission of the prior uncleared changes. In light of these legal errors and the presumption that "any ambiguity in the scope of the preclearance request" must be construed against the submitting jurisdiction, *id.*, at 257, "we are left with the definite and firm conviction," *id.*, at 258, that the court erred in finding that the Attorney General gave express approval to the earlier changes.

Appellants request that we set aside the elections held for these seats and remove the judges from office. This is not a proper matter for us to consider in the first instance. "[A] local district court is in a better position than this Court to fashion relief, because the district court 'is more familiar with the nuances of the local situation' and has the opportunity to

hear evidence." *Hathorn* v. *Lovorn*, 457 U. S., at 270, quoting *Perkins* v. *Matthews*, 400 U. S., at 397. In fashioning its decree granting relief, the District Court should adopt a remedy that in all the circumstances of the case implements the mandate of § 5 in the most equitable and practicable manner and with least offense to its provisions.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*