UNITED STATES of America, Plaintiff,

v.

CITY OF HOUSTON, et al., Defendants.

Jesse CAMPOS, W.R. (Resendez) Morris, and Mexican American Bar Association of Houston,

v.

CITY OF HOUSTON, et al., Defendants.

Nos. 91–3076, 91–3117.

United States District Court, S.D. Texas, Houston Division.

Aug. 21, 1992.

John David Lenoir, Sp. Asst. U.S. Atty., Houston, Tex., J. Gerald Hebert, Dept. of Justice, Civil Rights Div., Voting Section, Washington, D.C., for U.S.

Myra A. McDaniel, C. Robert Heath, Bickerstaff Heath & Smiley, Austin, Tex., for all other defendants.

Myra A. McDaniel, C. Robert Heath, Bickerstaff Heath & Smiley, Austin, Tex., Ann Hardy, Houston, Tex., for Anita Rodeheaver.

Michael J. Zomcik, Bonham Carrington & Fox, Houston, Tex., for Clymer Wright.

Pamela C. Oglesby, Texas Human Rights Foundation, Austin, Tex., for Annise Parker.

Frumencio Reyes, Jr., Reyes & Reyes–Castillo P.C., Houston, Tex., for Jesse Campos, W.R. (Resendez) Morris and Mexican American Bar Ass'n of Houston.

## MEMORANDUM OPINION ON MOTION OF UNITED STATES FOR ENTRY OF ORDER REQUIRING SPECIAL ELECTIONS

Before JONES, Circuit Judge, DeANDA, Chief District Judge, and LAKE, District Judge.

EDITH H. JONES, Circuit Judge:

Having considered the parties' arguments and the uncontested facts adduced, this three-judge court determines that it is neither appropriate to void the results of Houston's 1991 City Council elections for nine single-member districts [1] and order a special interim election to be conducted, nor is it proper to bow to the City's request

---

1. The United States, acting through the Justice Department, does not assert that the elections for mayor or the five at-large city council positions should be overturned.

that we retain jurisdiction to order relief in its favor. Recent developments, particularly the proposed settlement of the related case filed under § 2 of the Voting Rights Act against the City, militate against requiring an interim election. Additional background to this case is recited in our previous opinion and in other reported decisions.[2]

## I. SCOPE OF THIS COURT'S AUTHORITY

The Supreme Court has described the limits of this court's jurisdiction. We are to determine whether a particular voting or election practice is required to be precleared by the Justice Department under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, whether the local authority obtained preclearance from the U.S. District Court for the District of Columbia or the Attorney General before the election was held, and if not, what remedy may be ordered. *See, e.g., City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1983). That Houston's 1991 city council election took place under a districting plan that was required to be but was denied preclearance by the Justice Department is not here disputed.

When the Supreme Court has considered remedies for violations of section 5 after elections had taken place under non-precleared practices, it has always left the final remedial decision in the hands of the trial court. *Allen v. State Bd. of Elections,* 393 U.S. 544, 563, 89 S.Ct. 817, 830, 22 L.Ed.2d 1 (1969); *Perkins v. Matthews,* 400 U.S. 379, 394–98, 91 S.Ct. 431, 440–41, 27 L.Ed.2d 476 (1971); *Berry v. Doles,* 438 U.S. 190, 193, 98 S.Ct. 2692, 2694, 57 L.Ed.2d 693 (1978); *Hathorn v. Lovorn,*

457 U.S. 255, 269–72, 102 S.Ct. 2421, 2430–31, 72 L.Ed.2d 824 (1982); *N.A.A.C.P. v. Hampton County Election Comm.,* 470 U.S. 166, 181–83, 105 S.Ct. 1128, 1137–38, 84 L.Ed.2d 124 (1985). This was also true in *N.A.A.C.P.,* the one case in which the Court suggested that if after-the-fact preclearance of a voting change was not obtained, the ordering of a new election might be an appropriate remedy. U.S. at 183 n. 36, 105 S.Ct. at 1138 n. 36. In no case has a *presumptive* remedy of voiding the election been endorsed by more than two members of the Court. *See Berry, supra,* 438 U.S. at 192–96, 98 S.Ct. at 2694–95, (Brennan, Marshall, JJ.). The United States relies upon *Clark v. Roemer,* —— U.S. ——, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991), but as that opinion states, it does not discuss "the *ex post* question whether to set aside illegal elections."[3] We therefore disagree with the contention of the Justice Department that ordering new elections is the "presumptively appropriate remedy" for the lack of preclearance of apportionment Plan # 2 under which Houston's election took place.

Courts in our circuit have held that ordering new elections in the wake of a section 5 violation is a "drastic remedy" that should only be imposed when absolutely necessary to vindicate, establish or protect important voting rights. *United States v. Louisville Municipal Separate School District,* 557 F.Supp. 1168, 1172 (3–judge court, N.D.Miss.1983) (on remand from the Supreme Court's decision in *Hathorn v. Lovorn, supra* ). In *Cook v. Luckett,* the Fifth Circuit declined to void the results of a local election even though it reversed the district court's decision that had implemented an un-precleared districting plan proposed by private plaintiffs rather than a

**2.** *Campos v. City of Houston,* 776 F.Supp. 304 (S.D.Tex.1991), stay denied, *Campos v. City of Houston,* —— U.S. ——, 112 S.Ct. 354, 116 L.Ed.2d 314 (1991) and vacated, *Campos v. City of Houston,* 960 F.2d 26 (5th Cir.1992), reh'g, en banc, denied, *Campos v. City of Houston,* 968 F.2d 446 (5th Cir.1992); *United States v. City of Houston et al.,* No. 91–3076, 91–3117 (S.D.Tex. 1991).

**3.** The Supreme Court held in *Clark* that a three-judge court abused its discretion by failing to

enjoin *ex ante* the conduct of elections for non-precleared judicial posts. However, Louisiana state authorities had been on notice of a challenge to non-precleared judicial districts for three years before the elections occurred. There is no equitable comparison between that case and this one, in which the City's attempted redistricting followed closely on the heels of the 1990 Census Report.

precleared legislative plan. 735 F.2d 912, 921 *et. seq.* (5th Cir.1984). The court reiterated an earlier holding that elections will not be set aside absent " 'serious voting violations or aggravating factors, such as racial discrimination or fraudulent conduct ...' " 735 F.2d at 922 (quoting *Saxon v. Fielding,* 614 F.2d 78, 79 (5th Cir.1980)).

Two lower-court cases cited by the government to support its motion for a new election are distinguishable. In one of them, the court ordered a new election as a remedy for the impermissible conversion to staggered-term elections of county supervisors. *United States v. Onslow County,* 683 F.Supp. 1021 (E.D.N.C.1988). Some such order was obviously the only means to change from staggered terms to concurrent terms. In the other case, office-holders were elected under an invalid system to four-year terms. The court ordered new elections after two years. *United States v. Cohan,* 358 F.Supp. 1217 (S.D.Ga.1973).[4]

Ordering new elections is a drastic remedy for reasons that should be obvious. When elections have been held—even under a voting scheme that does not technically comply with section 5—the people have chosen their representatives. Neither the Justice Department nor this court should lightly overturn the peoples' choices. Second, as the cost of ordering new elections may be high relative to other public priorities, a jurisdiction forced into holding a special election has much less to spend on those other necessities. This cost should not be cavalierly brushed away by other branches of government, whether federal or judicial, that neither pay it nor impose the tax burden on which a remedy depends.

Further, the rationale for requiring new elections seems particularly weak where, as here, officeholders serve for only two years. Given the usual delays of litigation, ordering a special election would ordinarily result in the installation of the court-approved electoral scheme for only a few months before the regular election cycle begins. What benefit accrues to the public from this interference is dubious. A special election also tends to skew the process of candidate selection. Potential candidates must decide to run, and to change their personal and professional schedules dramatically, on much shorter notice than they would face in preparing for a regular election cycle, and they must make this decision in the face of two extraordinary obstacles. First, tremendous uncertainty inheres in the typical low turnouts at special elections. Second, a significant financial hurdle is imposed by the prospect of a candidate's financing not one but two electoral races in close proximity—those for the special election and the ensuing regular election.

In endorsing the rule that ordering new elections is a drastic remedy to be reserved for the most egregious cases, we do not foresee that such a rule will undermine compliance with section 5 preclearance procedures. Most public officeholders take just as seriously as does the Justice Department their responsibility to follow the Voting Rights Act. It is significant that notwithstanding consistent Supreme Court authority that places discretion in the trial court to fashion a remedy for section 5 violations, and notwithstanding the thousands of voting changes that are the subject of preclearance requests each year, only a handful of reported cases deal with a dispute over the appropriate remedy for section 5 violations after an election has taken place.

## II. WHAT REMEDY IS APPROPRIATE IN THIS CASE

■ Like the courts in *Louisville* and *Cook,* we do not find here the "drastic

---

**4.** It is incorrect to suggest, as does the Justice Department, that a "very similar action" was presented in *Coalition to Preserve Houston v. Interim Bd. of Trustees,* 494 F.Supp. 738, 742 (S.D.Tex.1980), aff'd and appeal dism'd, 450 U.S. 901, 101 S.Ct. 1335, 67 L.Ed.2d 325 (1981).

In the *Coalition to Preserve Houston* case, the defendants, the trustees of the Westheimer Independent School District, had created a new political entity in direct violation of a Justice Department order. *Id.* at 740, with the demonstrated discriminatory intent of frustrating a busing decree. *See, Ross v. Houston Indep. Sch. Dist.,* 457 F.Supp. 18, 26 (S.D.Tex.1977), aff'd in part, vacated in part, 583 F.2d 712 (5th Cir. 1978). None of these facts are present in this case.

circumstances" that require ordering a new election in Houston before the regular city elections in 1993. We discern no section 5 impediment to the settlement negotiated in the companion section 2 case. That settlement, reached in June between Hispanic plaintiffs and the City, provides that the voters of Houston will decide—again— whether to enact a 16–6–1 council configuration, or will vote in the 1993 city council elections in districts substantially similar to those contained in the previously precleared Plan # 3 boundaries.[5] Because the settlement enforces an apportionment plan based on one that has mustered section 5 preclearance, we do not need to impose any additional remedy at this time.

These conclusions are based on an evaluation of the following equitable factors.

First, the 1991 city elections were, to put it mildly, not conducted without judicial scrutiny of the issue that confronts us here. The district court's choice of injunctive relief, although later overturned on appeal, was reviewed on an expedited basis by the Fifth Circuit, the Supreme Court and this court. As was stated in *Louisville*, "local ... officials as well as the ... electorate should have the right to rely upon prior judicial determinations ... unless there are compelling reasons to the contrary." 557 F.Supp. at 1172.

Second, there is no evidence that the city elections were infected by invidious discrimination or serious irregularities[6] or that minority votes were substantially diluted. In fact, a contrary evaluation seems more accurate: Black and Hispanic candidates were elected to at-large council posts, defeating opponents of other races in the process, and minority candidates succeeded in being elected to the "minority districts" extant under Plan # 2. Houston's city council now includes two Hispanics, four Blacks, and eight Whites. The Justice Department's complaints ring hollow against these indicia of the vitality of minority electoral opportunities. The federal government's interest would have been far better served by a gracious acknowledgment of these results rather than by its rigid insistence upon obtaining immediate compliance with section 5.[7]

Third, salient facts were ignored by the Justice Department's submissions that, from the Hispanic voters' perspective, argue against holding a special election. City council term limits were approved by the voters in November 1991; in any succeeding city election there will be a significant turnover of the council's membership, wiping out the advantages of incumbency that might otherwise dilute minority opportunities. Because Plan # 3 as precleared by the Justice Department provides for one of the two potential "Hispanic" council districts in which Hispanics comprise only 27% of the registered voter population and 50.-

---

5. Plan # 3 provides for five at-large districts, a mayor, and nine single member districts, in two of which Hispanic voting-age population constitutes 58.14% and 50.50% of the population respectively. The city acknowledges that minor changes to the previous configuration of Plan # 3 will require submission to the Justice Department for preclearance.

6. We decline the parties' requests to cast aspersions on either side for pre-election delays in the administrative preclearance process. There is no record of bad faith by the City, and the Justice Department's tardiness indicates no more than bureaucratic inertia. Redistricting to accommodate the then-controversial 1990 census results was difficult for all parties to the process. Assessing blame might have been relevant as part of the balancing of equities *prior to* the election, cf. order of Scalia, J., *Campos v. City of Houston*, — U.S. ——, 112 S.Ct. 354, 116 L.Ed.2d 314 (1991), but it serves no point at this late date.

7. The Justice Department's staunch adherence to Plan # 3, in the face of electoral reality as well as the goals of section 5, seems strange. The Justice Department refused to preclear Houston's Plan # 2 because it contains only one "safe" Hispanic district. Plan # 3 was fashioned with a bare majority of voting-age Hispanics in two districts.

The Justice Department's assertion here seems to be that while plan # 2 created one safe Hispanic district, it was less desirable than plan # 3 which created two marginal Hispanic districts. This position assumes that the legal standard in section 5 cases is to maximize minority representation. This is an incorrect statement of law. The correct standard for section 5 preclearance cases is, in the words of the Supreme Court in *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) and *City of Lockhart v. United States*, 460 U.S. 125, 133, 134 n. 10, 103 S.Ct. 998, 1003, 1004 n. 10, 74 L.Ed.2d 863 (1983), to prevent "retrogression".

50% voting age population, a voter registration drive would be necessary to assure optimal Hispanic participation. Such a drive would be hard to mount concurrently with the expedited election schedule sought by the Justice Department. The federal government's eagerness to press a premature election date, far from vindicating Hispanic voters' role in the electoral process, could undermine their role simply to preserve the Justice Department's section 5 preclearance rights.

Fourth, the Justice Department's request is essentially a collateral attack upon the settlement that the City has reached with Hispanic plaintiffs in the pending section 2 voting rights action. To the extent the Justice Department contends that the section 2 court "lacked jurisdiction" to order the city elections to go forward in November 1991, its argument has been refuted by the revised Fifth Circuit opinion in the case. *See Campos v. City of Houston,* opinion on rehearing, 968 F.2d 446 (5th Cir.1992). Because the district court had jurisdiction to order some relief before the 1991 elections, and because it maintains jurisdiction to approve a settlement that complies with the Voting Rights Act, it would be most unseemly for this coordinate court, by ordering a new election, to grant the kind of relief that the Fifth Circuit refused. This is not to say that we, as a three-judge court, lack jurisdiction to grant the relief sought by the United States. Rather, we conclude that it would be an unwise exercise of our discretion to interfere with the settlement of a bona fide, hotly contested section 2 case, which has been predicated upon the implementation of nearly the same redistricting plan that the Justice Department precleared.

### III. CONCLUSION

Although Houston's 1991 city council election technically was held under an uncleared apportionment plan, the "drastic circumstances" do not exist that mandate this court's entering an order voiding the results of that election and requiring a special election to be held. An appropriate remedy is the one embodied in the settlement proposed between the Hispanic plaintiffs and the City in the pending section 2 litigation, for it contemplates that City elections held in due course in 1993 will be conducted under an apportionment plan tailored upon the one that the Justice Department has already precleared. This prospective relief is, under the circumstances of this case, sufficient to satisfy the demands of section 5. *Louisville, supra.* As that settlement will be implemented by the section 2 court, this court need not issue a redundant order.

These cases are DISMISSED.