Tyrone BROOKS, et al., Plaintiffs,

v.

STATE BOARD OF ELECTIONS, et al., Defendants,

Donald Cheeks, et al., Intervenors.

No. CV 288–146.

United States District Court,
S.D. Georgia,
Brunswick Division.

Nov. 2, 1993.

Laughlin McDonald, Kathleen L. Wilde, Neil Bradley, ACLU, Atlanta, GA, J. Gerald Hebert, Dept. of Justice—Civil Rights Div., Washington, DC, for plaintiffs.

Stanley Curtis House, Augusta, GA, Charles Leslie Wilkinson, III, Augusta, GA, for intervenor-plaintiffs.

David Frank Walbert, Walbert & Herman, Carol Atha Cosgrove, Atlanta, GA, for defendants.

Edmund Booth, pro se.

Donna M. Murphy, Dept. of Justice, Civil Rights Div., Voting Section, Washington, DC, for U.S.

Thomas R. Burnside, Jr., amicus, pro se.

Before KRAVITCH, Circuit Judge, EDENFIELD, Chief District Judge, and BOWEN, District Judge.

### OPINION AND ORDER

PER CURIAM:

For the third time in less than four years we are urged to modify our remedial order in this voting rights class action. Pending before the court is the joint motion of plaintiffs and defendants to allow interim gubernatorial appointments to certain vacant judicial posts pending a final decision by the court on the parties' proposed settlement agreement. Intervenors oppose the interim appointments.

For the reasons below, the joint motion is DENIED. In addition, we SEVER the section 5 portion from the section 2 portion of the case. Henceforth all papers and arguments regarding the proposed settlement shall be presented to, and all decisions involving the settlement shall be made by, the single-judge district court in the section 2 matter.

## I.

### A.

Plaintiffs' action, filed in 1988, challenges the manner in which state superior court judges are elected in Georgia. Plaintiffs allege that the state's electoral scheme dilutes minority voting strength in violation of section 2 of the Voting Rights Act of 1965 (the Act), Pub.L. 89–110, Title I, § 2, 79 Stat. 437 (codified as amended at 42 U.S.C. § 1973 (1988)). They also allege that defendants violated section 5 of the Act, 42 U.S.C. § 1973c, by failing to obtain preclearance [1] for numerous judgeships enacted after November 1, 1964. This three-judge district court was convened pursuant to the Act to consider the section 5 claim. *See* 42 U.S.C. § 1973c; 28 U.S.C. § 2284.[2]

On December 1, 1989, we held that judicial elections fall within the purview of section 5; that Georgia's electoral scheme creates the potential for discrimination against minority voters; and that defendants failed to obtain preclearance as required by the Act. *Brooks v. State Bd. of Elections*, 775 F.Supp. 1470, 1476, 1480 (S.D.Ga.1989), *modified on other grounds*, 775 F.Supp. 1490 (S.D.Ga.), *and aff'd*, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990) (*Brooks I*). We have been occupied since by the difficult task of shaping appropriate equitable relief.

As a general rule, the court should enjoin voting changes that are subject to section 5 but have not been precleared. *Clark v. Roemer*, 500 U.S. 646, ——, 111 S.Ct. 2096, 2101, 114 L.Ed.2d 691 (1991). "No new voting practice or procedure may be enforced unless the State ... has succeeded [in obtaining preclearance]." *United States v. Board of Supervisors*, 429 U.S. 642, 645, 97 S.Ct. 833, 834, 51 L.Ed.2d 106 (1977). Thus, in our original order, we held that

the Governor may not appoint judges to any non-precleared position created in 1989 until that position has been precleared. Further ... in the case of a judgeship added to a pre-existing [state judicial] circuit, [judgeships which currently are occupied,] no further election can be held for that position if the position is not precleared.

*Brooks I*, 775 F.Supp. at 1483. To avoid creating a vacuum in the Georgia judiciary, however, overburdening validly installed judges and throwing the court system into chaos, we declined to void completely all unprecleared, existing judgeships. Rather we allowed incumbents in unprecleared judgeships to serve out their terms of office. *Id.* at 1484.

On May 29, 1990, we extended our order to permit incumbents whose terms were to expire in 1990 to continue to serve in unprecleared judgeships until one of three contingencies occurred: the Supreme Court reversed our original order; the U.S. District Court for the District of Columbia (D.C. District Court) precleared the judgeships;[3] or the Georgia legislature enacted a new scheme for judicial elections, the scheme was precleared, and an election was conducted pursuant to the scheme. *Brooks v. State Bd. of Elections*, 775 F.Supp. 1490, 1491 (S.D.Ga. 1990) (*Brooks II*). The Supreme Court summarily affirmed our modified order. *State Bd. of Elections v. Brooks*, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990). Defendants subsequently filed an action in the D.C. District Court seeking a declaratory judgment preclearing the relevant judgeships. *State of Georgia v. Reno*, CV 90–2065 (D.D.C., filed Aug. 24, 1990).

Nearly two years later, in view of slow progress in the District of Columbia action,

---

1. "Preclearance" is a certification that a covered voting "qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." It may be obtained from either the Attorney General of the United States or the United States District Court for the District of Columbia. 42 U.S.C. § 1973c.

2. A more detailed account of the background to this case may be found in our opinion granting plaintiffs' motions for summary judgment and injunctive relief. *See Brooks v. State Bd. of Elections*, 775 F.Supp. 1470, 1472–74 (S.D.Ga.1989).

3. At the time we entered this order, the Attorney General already had declined to withdraw his objections to the judgeships. Thus we contemplated that preclearance would come, if at all, from the D.C. District Court. *See supra* note 1.

defendants sought two further grants of equitable relief from our injunction. First, defendants asked that we permit incumbent judges whose terms were to expire in 1992 to hold over in their posts, just as we had done with judges whose terms were to terminate in 1990. Second, they requested that we allow the Governor to make interim appointments to twelve, newly-created (and thus never-filled) unprecleared judgeships.

In an order entered April 22, 1992, we permitted the 1992 incumbent judges to remain in office for the same reasons we set forth earlier with respect to the 1990 incumbents: our concern that voiding all unprecleared judgeships when the incumbents' terms expired would seriously disrupt Georgia's judicial system and our assumption that defendants would pursue judicial preclearance with dispatch. *Brooks v. State Bd. of Elections*, 790 F.Supp. 1156, 1159 (S.D.Ga. 1992) (*Brooks III*). We declined, nevertheless, to allow interim appointments to new posts. As in *Brooks I* and *Brooks II* we explained that

> [t]here is a distinction between allowing incumbent judges to remain in their posts pending the outcome of the declaratory action, and allowing the Governor to appoint judges to newly-created, unprecleared judgeships.... Our decision to permit the incumbent judges whose terms expired in 1990 and 1992 to remain in office, subject to certain contingencies, is a narrow exception to the general rule that "[i]f voting changes subject to § 5 have not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting the State from implementing the changes."

*Id.* at 1160–61 (quoting *Clark*, 500 U.S. at ——, 111 S.Ct. at 2101 (citing *Allen v. State Bd. of Elections*, 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969))). Our injunction allowing incumbents to remain in their posts will expire March 1, 1994. *Id.* at 1160.

**B.**

On June 17, 1992, with the declaratory judgment action still pending in the D.C. District Court, plaintiffs and defendants executed a "Settlement Memorandum" in an effort to resolve their dispute. The proposed agreement provides, *inter alia*, that after 1992, all superior court, state court,[4] and appellate court judgeships be filled by gubernatorial appointment, and that sitting judges be subject only to "Missouri-style" retention elections, effectively abolishing the current procedure of electing judges as provided in the Georgia Constitution, *see* Ga. Const. art. VI, § 7;[5] that at least twenty-five black judges be serving on the superior courts by the end of 1994; that to reach the twenty-five-black-judge minimum "State Assignment Superior Court Judgeships" may be created, which judges shall serve by assignment in any of the state's judicial circuits; and that Senior U.S. District Judge Anthony Alaimo serve as arbitrator of disputes arising under the agreement, with specific authority to oversee the judicial appointment process. The agreement was made contingent upon approval by the Department of Justice. Of course, to become effective it also requires the approval of the court. *See* Fed.R.Civ.P. 23(e).

Soon after the proposed settlement was announced, we granted intervenors' motion to join the litigation. Intervenors are citizens and registered voters of the State of Georgia. They claim that the settlement, if implemented, would violate their state constitutional right to elect judges and their federal constitutional rights to due process and equal protection of the laws.

On August 30, 1993, the U.S. Attorney General conditionally assented to the proposed settlement, subject to final approval of the settlement by the federal courts. She concluded that the system contemplated by the proposed settlement would not abridge minority voting rights in violation of the Voting Rights Act. She did not address the

---

4. The state courts are courts of limited original jurisdiction. Ga. Const. art. VI, § 1, ¶ 1.

5. In Missouri the governor appoints judges to office pursuant to a "Non–Partisan Court Plan." To remain in office, they must survive periodic retention elections, in which he or she runs unopposed subject only to a "yes or no" vote. Mo. Const. §§ 25(a)–(g); *Gregory v. Ashcroft*, —— U.S. ——, ——, 111 S.Ct. 2395, 2398, 115 L.Ed.2d 410 (1991).

question whether the twenty-five-black-judge-minimum provisions of the settlement create an unconstitutional racial classification. In the wake of this conditional approval, defendants—this time with the blessing of both plaintiffs and the United States (as *amicus curiae*)—moved once again that the Governor be permitted to fill on an interim basis several superior court seats enacted since 1989 but effectively frozen by our earlier injunctive orders.

## II.

The parties' joint motion and the United States's *amicus* brief present essentially two arguments why the court should allow the Governor to make interim appointments to the unfilled judgeships in question. First, they assert that by its letter of August 30, 1993, the Justice Department now has precleared these positions. Alternatively, they contend that the equities have shifted since our earlier rulings forbidding interim appointments. Hence, they argue we should exercise our discretionary power to adapt our equitable remedy to the changed circumstances. Neither argument is availing.

### A.

■ Contrary to the assertions of plaintiffs, defendants, and even the United States itself, the Attorney General has not precleared the unfilled judgeships. The Justice Department's letter of August 30, 1993 did not pass on the judgeships as they presently exist. Rather it approved them as part of a comprehensive proposed settlement agreement. Significant to the Department's conclusion that enactment of the judgeships would not discriminate against minority voters was the fact that several provisions of the proposed settlement aim to remedy the discriminatory impact on minorities of the current judicial selection system. *See* Letter from James P. Turner, Acting Assistant U.S. Attorney General, Civil Rights Division, to Michael J. Bowers, Attorney General, State of Georgia, at 4 (August 30, 1993). Thus, the Justice Department's approval of the judgeships is contingent upon subsequent assent by the federal courts to the proposed settlement: "[T]he objections interposed to the voting changes ... will be withdrawn *upon approval of the proposed consent decree* in *Brooks* by the United State [sic] District Court." *Id.* at 4–5 (emphasis added). By the Department's own admission, "the objections previously interposed to the twelve superior court judgeships created in 1989–1991 *are still in effect*, [although] only conditionally, and these objections *will be* withdrawn *upon approval of the proposed consent decree.*" Memorandum of the United States Amicus Curiae In Response To Joint Motion at 4 (emphasis added); *see id.* at 5–6. Court approval of the proposed settlement, therefore, is an essential element of the Attorney General's affirmation. The Department expressly states that if the settlement is rejected "the Section 5 status of these judgeships and the equities of the situation would change considerably." Memorandum of the United States at 6–7.

The proposed settlement has yet to be approved. Nor is approval so assured as to be deemed *pro forma*. Although we express no opinion on the propriety of the proposed consent decree as that is a subject for the single-judge district court, *see infra* Part III, we note that intervenors have raised serious constitutional challenges to the agreement. Thus, the Justice Department's stated prerequisite for preclearance has not been satisfied. As such, defendants are not entitled to fill, even temporarily, the unprecleared new judgeships.

### B.

■ Although we are not compelled to allow the requested appointments because the judgeships have not been precleared, we *may* do so in the exercise of our equitable discretion. *See, e.g., Perkins v. Matthews,* 400 U.S. 379, 396–97, 91 S.Ct. 431, 441, 27 L.Ed.2d 476 (1971) (holding that district court may fashion an appropriate remedy). Hence, the remaining question is whether present circumstances warrant a reversal of our earlier rulings rejecting defendants' request for interim appointments.

■ The most dramatic difference between the current situation and our previous rulings is the one-hundred-eighty-degree

shift in positions by plaintiffs. Previously, plaintiffs vigorously opposed interim appointments. Now, having entered into the proposed settlement agreement with defendants and evidently confident that the appointments would be to their liking, plaintiffs join defendants in seeking the court's permission for interim appointments. This turnabout is important because a primary purpose of a section 5 injunction is to protect the asserted interests of the plaintiffs. *See Clark,* —— U.S. at ——, 111 S.Ct. at 2101 ("If voting changes subject to § 5 have not been precleared, *§ 5 plaintiffs* are entitled to an injunction prohibiting the State from implementing the changes.") (emphasis added).

Nevertheless, the responsibility for crafting equitable relief lies exclusively with the federal court. The plaintiffs' interests are but one factor, albeit an important one, the court must consider when deciding whether to modify its injunction. This principle is particularly true in a case such as this, when intervenors have entered the equation. "In fashioning its decree granting relief, the district court should adopt a remedy that in *all the circumstances of the case* implements the mandate of § 5 *in the most equitable and practical manner* and with least offense to its provisions." *Id.* 500 U.S. at ——, 111 S.Ct. at 2105 (emphasis added).

Plaintiffs, defendants, and the United States offer several equitable and practical reasons why permitting interim appointments would be appropriate. Implementation of the agreement, they point out, already is months behind the originally anticipated schedule. A final resolution of the validity and propriety of the proposed consent decree may not be forthcoming for quite a while, given the likelihood of appeal. In the meantime, the Governor needs time to canvass potential candidates for appointment if the twenty-five-black-judge minimum is to be reached by the agreement's deadline of December 31, 1994. Further, they argue that if the agreement could begin to be implemented, some of the more controversial provisions of the consent decree might be removed as moot. If, with appointments now, for instance, the parties can make significant prog-

ress toward the State's numerical commitments under the proposed settlement, then both the twenty-five-judge-minimum and the "State Assignment Judgeships" provisions of the proposed consent decree might become unnecessary.

Stripped to its bare essentials, the parties' argument is a request for permission to begin to implement the proposed settlement in part while the parties and intervenors litigate the settlement's ultimate propriety. In this sense, the relief the parties seek is analogous to a preliminary injunction. As we consider how to exercise our equitable discretion, therefore, we find it helpful to consult the traditional criteria for preliminary injunctions: whether the moving parties have shown a substantial likelihood of success on the merits; whether they face a substantial threat of irreparable harm; whether the threatened injury to the moving parties outweighs the threatened harm an injunction may cause their opponents; and whether ruling in favor of the moving parties will disserve the public interest. *E.g., West Point–Pepperell, Inc. v. Donovan,* 689 F.2d 950, 956 (11th Cir.1982). Each of these considerations weighs against allowing the interim appointments in this case.

It is not for this court to say whether the settlement ultimately will be approved. We note, however, that, at the very least, serious questions exist as to whether plaintiffs and defendants have a substantial likelihood of success in this regard. In *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), for example, the Supreme Court struck down a plan to set aside a fixed percentage of public works contracts for minority business enterprises as not narrowly tailored to the compelling governmental interest in remedying past discrimination. *Id.* at 511, 109 S.Ct. at 731. Here, the proposed consent decree similarly calls for a minimum of twenty-five black superior court judges by the end of 1994. A strong argument exists that this "numerical commitment[ ]"[6] violates the Equal Protec-

---

**6.** Brief in Support of Joint Motion at 4; *see also* Joint Motion at 3, 4.

tion Clause as construed in *J.A. Croson.*[7] Equally difficult questions exist as to whether the federal district court can, or should, employ its equitable powers to compel changes to a state electoral system grounded in the state constitution. Although the settlement may be valid, we cannot say that the likelihood of approval is any more "substantial" than the likelihood of disapproval.

Furthermore, we do not believe that irreparable injury likely will befall the parties if these judgeships remain temporarily unfilled. We recognize that allowing the appointments would help alleviate the burgeoning caseload which sitting superior court judges currently must bear. But time and again—at plaintiffs' urging—we have rejected this proffered justification for excusing unprecleared voting changes. *See Brooks III,* 790 F.Supp. at 1160; *Brooks II,* 775 F.Supp. at 1491. We are also sympathetic to the Governor's need for adequate time to make careful appointments should the proposed settlement be approved. He is not prevented from researching and soliciting potential judges, however, simply because those judgeships presently may not be filled.

The harm about which plaintiffs and defendants seem most concerned is their potential inability to effectuate the settlement by the arbitrary date set in the agreement. At best this concern is valid only to the extent the settlement itself is valid, and the validity of the settlement is a separate question for the single-judge court. Moreover, plaintiffs' and defendants' interest in implementing the agreement runs headlong into intervenors' equivalent, though countervailing, interest in avoiding an as-yet-unapproved consent decree which may ultimately be rejected as violative of their constitutional rights. Yet enforcement of the consent decree is precise-

ly what plaintiffs and defendants aim to accomplish with the present motion. By their own admission they seek to "begin implementation" of their proposed settlement agreement. Joint Motion at 4. Allowing even partial implementation of a controversial settlement agreement which subsequently may be rejected on constitutional grounds would be nothing less than sanctioning an end-run around the requirement of court approval of the proposed settlement. *See* Fed. R.Civ.P. 23(e). Such a result would undermine the judicial process, harming not only intervenors, but the public at large.

In sum, we believe the interests of justice are best served by preserving the status quo at this time. If and when the court approves the proposed consent decree, the equities might change. At that time we would entertain a renewed motion for interim appointments pending final appellate resolution of the settlement issue. If the court rejects the settlement, then the injunction should continue in force (subject to its already-scheduled expiration on March 1, 1994) without the need for further modification.

### III.

■ Our decision not to allow interim appointments to the newly-created, unprecleared judgeships underscores the need to accelerate review of the proposed consent decree in this case. To facilitate this review and, more specifically, to clarify our continuing role in this litigation, we hereby sever the section 5 portion from the section 2 portion of this case.

The jurisdiction of a section 5 three-judge district court is narrow in scope. Our task is threefold: to determine whether a voting change is covered by section 5; if so, to

---

**7.** The parts of the agreement providing for this minimum number are the very provisions the parties intend effectively to begin implementing with these interim appointments.

Defendants argue that the Governor constitutionally may consider race when making appointments, for diversity on the bench is a compelling governmental goal. *See* Brief in Support of Joint Motion at 4–5. This may be true. *Cf. Regents of Univ. of Calif. v. Bakke,* 438 U.S. 265, 311–312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (recognizing goal of

a diverse student body). But the fact that the Governor might properly consider race *as a factor* in making appointments does not necessarily mean that the state may set aside a specific number of positions for particular racial groups. *See id.* at 320, 98 S.Ct. at 2763. At most, defendants' argument presents a close question to be resolved when the court rules on the validity of the proposed settlement. It is insufficient at this point to demonstrate a "substantial likelihood" of success.

determine whether proper preclearance has been obtained; and, if not, to impose an appropriate equitable remedy. *See, e.g., City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1982); *United States v. Board of Supervisors,* 429 U.S. at 645–47, 97 S.Ct. at 834–35; *Brooks I,* 775 F.Supp. at 1474. Our equitable powers are confined to providing temporary relief while the state seeks preclearance from either the U.S. Attorney General or the D.C. District Court. We lack the authority to remedy substantive voting rights violations by sanctioning and imposing a new voting scheme. *See Edge v. Sumter County Sch. Dist.,* 541 F.Supp. 55, 57 (M.D.Ga.1981), *aff'd,* 456 U.S. 1002, 102 S.Ct. 2287, 73 L.Ed.2d 1297 (1982).

Four years have elapsed since we concluded our limited substantive role in this case, when we held that defendants had to seek preclearance for the uncleared judgeships enacted after November 1, 1964. *See Brooks I,* 775 F.Supp. at 1476–80. All that the three-judge section 5 court legally can do at this point is monitor and, if necessary, modify the temporary equitable remedy we imposed. Consequently, the validity and propriety of the proposed consent decree must be considered in the context of plaintiff's pending section 2 action, and claims under section 2 properly come before the single-judge district court. *Compare* 42 U.S.C. § 1973 (making no provision for three-judge court) *with* 42 U.S.C. § 1973c (making specific provision for three-judge court).

Precedent from other three-judge district courts supports this conclusion. In *United States v. City of Houston,* 800 F.Supp. 504 (S.D.Tex.1992), a section 5 court noted that the single-judge court hearing a parallel section 2 claim "maintain[ed] jurisdiction to approve a settlement that complies with the Voting Rights Act." *Id.* at 508. Similarly, in *Edge v. Sumter County Sch. Dist.,* the three-judge court, having determined the section 5 issue, remanded the case to a single-judge court to supervise the development of a legally enforceable election plan. 541 F.Supp. at 57; *see also Warren v. City of Tampa,* 693 F.Supp. 1051, 1062 (M.D.Fla.1988) (single-judge court approving settlement of action challenging city's system of electing city council members), *aff'd without opinion,* 893 F.2d 347 (11th Cir.1989).

Thus, in this case, the parties' proposed settlement should be considered solely by the presiding judge in the section 2 case. Accordingly, pursuant to our inherent power to control our docket, we sever plaintiffs' section 5 claims from the section 2 claims in this case. The three-judge court will continue to perform our carefully circumscribed role of providing any interim equitable relief in accordance with section 5.

### IV.

For the foregoing reasons:

(1) The joint motion of plaintiffs and defendants to allow interim appointment of vacant judicial posts pending a final decision by the single-judge district court on the parties' proposed settlement agreement is DENIED.

(2) The section 5 portion of this case is SEVERED from the section 2 portion of the case. All pleadings and arguments regarding the proposed consent decree hereafter shall be addressed to the single-judge court.

SO ORDERED.