B.C. FOREMAN, et al., Plaintiffs,

v.

DALLAS COUNTY, TEXAS, et al., Defendants.

No. CIV. A. 3:96–CV–2764–D.

United States District Court, N.D. Texas, Dallas Division.

Jan. 8, 1998.

J. Gerald Hebert (argued), Alexandria, VA, Kenneth H. Molberg, Wilson, Williams, Molberg & Mitchell, P.C., Dallas, TX, for Plaintiffs.

Robert S. Bickerstaff, Jr., C. Robert Heath (argued), Bickerstaff, Heath, Smiley, Pollan, Kever & McDaniel, L.L.P., Austin, TX, for Defendants.

Before PATRICK E. HIGGINBOTHAM, Circuit Judge, and FITZWATER and MEANS, District Judges.

FITZWATER, District Judge:

In this action brought pursuant to § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, we must decide whether we have authority to award plaintiffs the election fees that they maintain they lost when we declined to enjoin a plan for selecting precinct election judges. Because we hold that our limited power precludes us from granting this relief, and because subsequent events have provided all other remedies that plaintiffs seek, we deny their claim for lost election fees and we otherwise dismiss the case as moot.

## I

Plaintiffs B.C. Foreman ("Foreman"), Ida Clark ("Clark"), Otis Tarver ("Tarver"), Dominic De la Cruz ("De la Cruz"), Louis Davis ("Davis"), and Mandy Pesina ("Pesina") are minority citizens and registered voters residing in Dallas County, Texas. They brought this suit in October 1996 to enjoin Dallas County from implementing changes it had adopted in the method for appointing presiding and alternate presiding judges for county election precincts for the 1996–97 term.[1]

Presiding election judges in Texas are in charge of and responsible for the management and conduct of the elections at the respective polling places (precincts) where they serve. TEX. ELECTION CODE ANN. § 32.071 (West Supp.1998). Their powers and responsibilities range from controlling the working hours and duties of election clerks and administering oaths at polling places to preserving order and preventing breaches of the peace and violations of the Election Code. Id. §§ 32.072–.075 (West 1986 & Supp.1998). In performing these duties, they are authorized to appoint persons to act as special peace officers for the polling place, and are granted the power of a Texas district judge to enforce order and preserve the peace. Id. § 32.075 (West 1986 & Supp. 1998). The alternate presiding judge serves as presiding judge for an election if the presiding judge cannot serve. Id. § 32.001(b) (West 1986).

Texas law requires the presiding judge for each election precinct to appoint the alternate presiding judge as an election clerk. Id. § 32.032 (West 1986). Election clerks assist the presiding judge in conducting the election. Id. § 32.031 (West 1986). Presiding judges and clerks are compensated at equal hourly rates. Id. § 32.091 (West Supp. 1998). An election judge or clerk who delivers the precinct election records, keys to ballot boxes or other election equipment, and unused election supplies after an election, however, is entitled to additional compensation in an amount not to exceed $25.00.[2] Id. § 32.092(a) (West 1986).

The version of § 32.002 of the Election Code in effect in 1996 required that the Commissioners Court annually appoint presiding and alternate presiding election judges for each regular county election precinct. Id. § 32.002(a) (repealed 1997).[3] Although

---

1. Defendants are Dallas County, Texas, the Commissioners Court (its governing body), the County Judge (its chief executive officer), the individual Commissioners, and the County Elections Administrator.

2. If more than one election officer delivers the records, keys, and unused supplies, the presiding judge must determine how the amount fixed for the service is to be allocated among the officers. Id. § 32.092(b) (West 1986).

3. Section 32.002 (repealed 1997):

  (a) The commissioners court, at its July term each year, shall appoint the election judges for each regular county election precinct.
  (b) Judges appointed under Subsection (a) serve for a term of one year beginning on August 1 following the appointment.
  (c) The commissioners court shall fill a vacancy in the position of election judge for the remainder of the unexpired term. An appoint-

the Code required the Commissioners Court to "consider" the recommendations of the County Elections Administrator[4] before making an appointment, *id.* § 32.002(d) (repealed 1997), the statute vested the Commissioners Court with the discretion to appoint any qualified person.[5]

Between November 1, 1972, when Texas became a covered jurisdiction under the Voting Rights Act, and October 1996, when the appointment plan at issue was adopted, the Commissioners Court made several changes in the method of selecting election judges, without obtaining preclearance. From 1982 until 1995 Dallas County used a Presidential election formula. Under this regimen, the major party (Republican or Democrat) whose Presidential candidate carried a precinct in the most recent election was given the presiding judge appointment for that precinct; the other party was allotted the alternate presiding judge position.[6] In 1995 the Commissioners Court adopted a Senatorial method to be followed during the 1995–97 period. Under this procedure, the Commissioners Court considered the results of the 1994 general election for United States Senator "as one of the factors, along with previous performance and other individual qualifications, to be used in appointing election judges and alternates." DALLAS COUNTY, TEXAS ORDER NO. 95–1313 (1995) (repealed 1996).

In 1996 the Commissioners Court initiated the first of a series of orders that culminated in the present litigation. On September 3, 1996 it superseded the 1995 order by adopting the following appointment procedures for the 1995–1997 period: (1) In all voting precincts in which the Republican candidate for United States Senator received the most votes in the 1994 general election, the person submitted or approved by the Republican party would be named presiding election judge, and the person submitted or approved by the Democratic party would be named alternate presiding election judge, provided, however, that a majority of the Commissioners Court could choose not to appoint any individual. (2) In all other precincts, the Commissioner who represented the precinct would determine whether the person suggested or approved by the Republican or Democratic party would be the presiding election judge. The person named or approved by the party whose preference was not chosen to be presiding election judge would be named alternate presiding election judge, provided, however, that a majority of the Commissioners Court could choose not to appoint any individual.

After the Commissioners Court adopted the Senatorial method, plaintiffs filed this suit, seeking to block implementation of the order on the ground that the changes in the method of appointing election judges had not received § 5 preclearance. Following entry of a temporary restraining order, the Commissioners Court on October 8, 1996 rescinded the September order and implemented a procedure that followed § 32.002 of the Election Code, which had been precleared in 1985. The Commissioners Court received and considered the recommendations of the County Elections Administrator. It appointed Republican party recommendees as presiding election judges, and Democratic party recommendees as alternate presiding election

---

ment to fill a vacancy may be made at any regular or special term of court.

(d) The county clerk shall recommend a presiding judge and an alternate judge for each precinct and shall submit a list of the recommendations to the commissioners court. The clerk shall also recommend an appointee for each unexpired term. The court shall consider the clerk's recommendation before making an appointment.

(e) Subject to Section 32.003, the judges appointed under this section shall serve in each election ordered by the governor or a county authority in which the regular county election precincts are required to be used.

4. The Code actually stated that the Commissioners Court must consider the *County Clerk's* rec-

ommendations. *Id.* § 32.002(d) (repealed 1997). When a county creates the position of County Elections Administrator, however, the functions assigned to the County Clerk under the Code are performed by the County Elections Administrator. *Id.* § 31.043(2) (West 1986).

5. Except in an emergency, the person must be a qualified voter of the precinct. *Id.* § 32.051(a) (West Supp.1998).

6. If a third-party Presidential candidate carried a precinct, the appointment was made based on the votes received by the highest voted major party.

judges, to hold special and general elections for the term beginning August 1, 1996 and ending July 31, 1997.

Plaintiffs responded to the new order by amending their complaint to allege that the October 1996 plan violated § 5. They applied for a temporary restraining order and a preliminary injunction to preclude defendants from implementing the order, contending the necessary preclearance had not been obtained. We denied the application, holding in pertinent part that § 32.002 conferred discretionary authority on the Commissioners Court to appoint election judges, that this grant of authority was precleared, and that preclearance was not required for each exercise of this authority. *Foreman v. Dallas County, Tex.*, Civil Action No. 3:96–CV–2764–D, slip op. at 2–3 (N.D.Tex. Oct. 18, 1996) (per curiam). While we observed that the use of party affiliation as an informing principle for exercising appointment power could be tested under the Fourteenth and Fifteenth Amendments as well as § 2 of the Voting Rights Act, we concluded that in the exercise of the precleared discretionary system the "ebb and flow of political power, manifesting itself in an insistence on party affiliation, is not a change in election practice or procedure contemplated by § 5 of the Voting Rights Act." *Id.* at 3.

The Supreme Court denied a request for stay of our order pending appeal. *Foreman v. Dallas County, Tex.*, — U.S. —, 117 S.Ct. 378, 136 L.Ed.2d 297 (1996). The general elections in Dallas County were then conducted under the direction of presiding judges and alternate presiding judges selected under the method adopted on October 8, 1996. We later dismissed plaintiffs' suit on the merits pursuant to Fed.R.Civ.P. 12(b)(6), based on our earlier conclusion that § 5 of the Voting Rights Act did not mandate preclearance. *Foreman v. Dallas County, Tex.*, Civil Action No. 3:96–CV–2764–D, order at 1 (N.D.Tex. Feb. 7, 1997). Plaintiffs appealed our judgment and the Supreme Court vacated and remanded for further proceedings. *Foreman v. Dallas County, Tex.*, — U.S. —, 117 S.Ct. 2357, 2359, 138 L.Ed.2d 972 (1997) (per curiam).[7] The Court held that the fact that Dallas County "was exercising its 'discretion' pursuant to a state statute [did] not shield its actions from § 5." *Id.* at —, 117 S.Ct. at 2358. Instead, the controlling question was whether the County by its actions enacted or sought to administer any standard, practice, or procedure with respect to voting that was different from the one in place on November 1, 1972. *Id.* The Court also rejected our holding that the 1985 preclearance of the Election Code was sufficient to satisfy § 5. *Id.* Because the record was silent concerning the procedure used on November 1, 1972 for approving election judges, the Court remanded for further proceedings. *Id.* at —, 117 S.Ct. at 2358–59.

On May 28, 1997, prior to the Supreme Court's remand, the Texas Legislature amended § 32.002.[8] Effective September 1, 1997, revised § 32.002 adopts a Gubernatorial method.[9] Under this regimen, the Com-

---

**7.** The Supreme Court dismissed the appeal from our order denying injunctive relief. *Id.*

**8.** Plaintiffs maintain that this lawsuit caused the Texas Legislature to revise § 32.002. Ps. Oct. 20, 1997 Br. at 2 n. 2. This presents an issue pertinent to the attorney's fee question, to be decided separately as a single judge matter. *See Craig v. Gregg County, Tex.*, 988 F.2d 18 (5th Cir.1993) (appeal from denial of attorney's fees).

**9.** Section 32.002 (West Supp.1998):

(a) The commissioners court at its July term shall appoint the election judges for each regular county election precinct.

(b) Judges appointed under Subsection (a) serve for a term of one year beginning on August 1 following the appointment, except that the commissioners court by order record-

ed in its minutes may provide for a term of two years.

(c) The presiding judge and alternate presiding judge must be affiliated or aligned with different political parties, subject to this subsection. Before July of each year, the county chair of a political party whose candidate for governor received the highest or second highest number of votes in the county in the most recent gubernatorial general election shall submit in writing to the commissioners court a list of names of persons in order of preference for each precinct who are eligible for appointment as an election judge. The commissioners court shall appoint the first person meeting the applicable eligibility requirements from the list submitted in compliance with this subsection by the party with the highest number of votes in the precinct as the presiding judge and the first person meeting the applicable eligibility

missioners Court appoints presiding election judges and alternate presiding election judges based on lists provided by political party chairs. *Id.* § 32.002(c) (West Supp.. 1998). The first person who meets the applicable eligibility requirements and who is submitted by the party whose candidate for governor received the highest number of votes in the precinct in the most recent gubernatorial general election must be appointed the presiding election judge for the precinct. The first person who meets the applicable eligibility requirements and who is submitted by the party whose candidate for governor received the second highest number of votes in the precinct in the most recent gubernatorial general election must be appointed the alternate presiding election judge. The party's list binds the Commissioners Court, who may reject the list only if the persons whose names are submitted are determined not to meet the applicable eligibility requirements. *Id*.

The Attorney General precleared the revised version of § 32.002 on September 2, 1997. On October 7, 1997 the Commissioners Court appointed new presiding judges and alternate presiding judges according to revised § 32.002. All six plaintiffs were appointed presiding judges. Their terms expire July 31, 1998.

requirements from the list submitted in compliance with this subsection by the party with the second highest number of votes in the precinct as the alternate presiding judge. The commissioners court may reject the list if the persons whose names are submitted on the list are determined not to meet the applicable eligibility requirements. If the list is rejected, the appointment shall be made for the full term in accordance with the same procedures provided for the filling of vacancies under Subsection (d) based on the time of the rejection instead of the time that a vacancy occurs. If a list of names is not submitted in compliance with this subsection, the commissioners court shall appoint an eligible person who is affiliated or aligned with the appropriate party, if available.

(d) The commissioners court shall fill a vacancy in the position of election judge for the remainder of the unexpired term. An appointment to fill a vacancy may be made at any regular or special term of court. Not later than 48 hours after the county clerk becomes aware of a vacancy, the county clerk shall notify the county chair of the same political party with which the original judge was affili-

**II**

Defendants have filed a suggestion of mootness and contend the case should be dismissed.[10] They argue that the case is moot because after we declined to enjoin implementation of the October 1996 plan, the Texas Legislature amended § 32.002, the Attorney General precleared the new regimen, and the Commissioners Court superseded the challenged October 1996 order and appointed new judges (including plaintiffs).

Plaintiffs concede that a § 5 case "*can* become moot when the [unprecleared] procedure is abandoned or preclearance is obtained because there is no continuing harm." Ps. Oct. 20, 1997 Br. at 5. They maintain, however, that a case is not moot, and the effects of the violation continue, when victims of unlawful conduct are not completely restored to the positions they would have occupied had defendants not violated the law. *Id.* at 3, 5.

We hold that plaintiffs' suit is largely moot. In their first amended complaint, plaintiffs asked this court to (A) declare that the voting changes adopted by the 1996 plan were covered by § 5 and were legally unenforceable because they were not precleared; (B) enjoin defendants from implementing any method that had not been precleared; (C)

ated or aligned of the vacancy. Not later than the fifth day after the date of notification of the vacancy, the county chair of the same political party with which the original judge was affiliated or aligned shall submit to the commissioners court in writing the name of a person who is eligible for the appointment. If a name is submitted in compliance with this subsection, the commissioners court shall appoint that person to the unexpired term. If a name is not submitted in compliance with this subsection, the commissioners court shall appoint an eligible person who is affiliated or aligned with the same party, if available.

(e) Subject to Section 32.003, the judges appointed under this section shall serve in each election ordered by the governor or a county authority in which the regular county election precincts are required to be used.

10. Defendants also maintain that there have been no changes in procedure between November 1, 1972 and October 8, 1996 that require preclearance. Given our resolution of this case, we need not decide this question.

order defendants to seek administrative or judicial preclearance; (D) order that the 1996 election be conducted using a legally enforceable method of selecting election judges; (E) award plaintiffs their attorney's fees and costs; and (F) grant plaintiffs such further relief as the interest of justice may require. Plaintiffs concede that requests (A) through (D) have been rendered moot by actions of the Texas Legislature and/or the Commissioners Court.[11]

Plaintiffs maintain that the entire case is not moot because they now ask that the court award them lost election fees pursuant to item (F) of their prayer, in which they requested "such further relief as the interest of justice may require." Ps. First Am. Compl. at 6. They argue that because they were removed and replaced as presiding judges for the 1996–1997 term, "[a]ll that can be done at this juncture by way of relief is to restore plaintiffs to the position they would have been in but for the defendants' violation of Section 5." Ps. Oct. 20, 1997 Br. at 3. Plaintiffs Foreman and Tarver maintain that each lost from the 1996 election the $25.00 fee payable for returning the precinct election records, keys and equipment, and supplies. *See* TEX. ELECTION CODE ANN. § 32.092(a) (West 1986). Pesina contends she was deprived of this fee at both the 1996 and 1997 elections. Clark seeks no lost election fees. De la Cruz maintains that he lost $57.00 in hourly wages and was twice deprived of the $25.00 fee. Plaintiffs seek the total sum of $207.00.

We agree with plaintiffs that their claim for lost election fees is not moot. *See MCI Telecommunications Corp. v. Credit Builders of Am., Inc.,* 2 F.3d 103, 104–05 (5th Cir.1993) (holding that claim for monetary relief automatically avoids mootness, so long as claim remains viable, and that damages

should be denied on the merits, not on grounds of mootness). We therefore decline to dismiss the entire case on that basis. For reasons we will explain, however, we hold that we lack authority to award lost election fees, and we deny the claim on the merits.

### III

We have authority to consider the sufficiency of a complaint on our own initiative. *Guthrie v. Tifco Indus.,* 941 F.2d 374, 379 (5th Cir.1991) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357, at 301 (1990)).[12] The question we must decide is whether, as a three-judge local district court, we are authorized to award plaintiffs the narrow relief they seek. "[C]ongressional enactments providing for the convening of three-judge courts must be strictly construed." *Allen v. State Bd. of Elections,* 393 U.S. 544, 561, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). "[A] three-judge court convened under Section 5 is a court of limited jurisdiction and limited authority." *Campos v. City of Houston,* 968 F.2d 446, 451 (5th Cir.1992) (per curiam).

We have analyzed the purpose of § 5, the contours of a private party's right of action to enforce preclearance, the role of the three-judge local district court in the clearance regimen of the Voting Rights Act, and decisions that impose remedies under § 5. We hold that we lack any authority to award plaintiffs lost election fees.

### A

Neither the purpose of § 5 nor the Supreme Court's construction of the rights of private parties to enforce its provisions supports the assertion that successful private litigants may recover relief in the form of lost election fees.[13]

---

**11.** *See, e.g.,* Ps. Oct. 20, 1997 Br. at 3 (stating that "[a]ll that can be done at this juncture by way of relief is to restore plaintiffs to the position they would have been in but for the defendants' violation of Section 5.").

**12.** We hold that plaintiffs had fair notice, albeit in the context of the issue of mootness, that we would consider whether we have authority to award lost election fees. Plaintiffs briefed this issue and addressed it at oral argument.

**13.** Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on No-

The purpose of § 5 is to "prevent[ ] jurisdictions covered by its requirements from enacting or seeking to administer voting changes that have a discriminatory purpose or effect." *Lopez v. Monterey County, Cal.,* — U.S. —, 117 S.Ct. 340, 343, 136 L.Ed.2d 273 (1996). It "has a limited substantive goal: to insure that no voting-procedure changes would be made that would lead to retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Bush v. Vera,* — U.S. —, 116 S.Ct. 1941, 1963, 135 L.Ed.2d 248 (1996) (plurality opinion) (internal quotations omitted) (quoting *Miller v. Johnson,* 515 U.S. 900, 926, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)).

Section 5 is a congressional "response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) (citation omitted) (quoting legislative history). This was possible "because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory." *Id.* Congress "shift[ed] the advantage of time and inertia from the perpetrators of the evil to its victim by freezing election procedures in the covered areas unless the changes [could] be shown to be nondiscriminatory." *Id.* (internal quotations omitted). "By prohibiting the enforcement of a voting-procedure change until it has been demonstrated to the United States Department of Justice or to a three-judge federal court that the change does not have a discriminatory effect, Congress desired to prevent States from undo[ing] or defeat[ing] the rights recently won" by African-Americans. *Id.* (internal quotations omitted). "Congress designed the preclearance procedure 'to forestall the danger that local decisions to modify voting practices will impair minority access to the electoral process.'" *Lopez,* — U.S. at —, 117 S.Ct. at 348 (quoting *McDaniel v. Sanchez,* 452 U.S. 130, 149, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981)).

vember 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

The aim of the § 5 enforcement mechanism is not compensation. There is no hint that voters, candidates, or office holders are entitled to recover monetary losses associated with a violation of the right to vote. In furthering the goals of the Voting Rights Act, § 5 adopts a singular and simple means: to force government bodies to tack closely to existing voting qualifications, prerequisites, standards, practices, or procedures, and to provide expeditious and effective declaratory and injunctive relief when they do not.

### 2

The implied right of action that the Supreme Court held is vested in private parties under § 5 does not provide a right to recover lost election fees. In *Allen* the Court addressed the question whether private litigants may invoke the jurisdiction of the district courts to obtain relief pursuant to 28 U.S.C. § 1343(a)(4), which provides that "[t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person ... to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." *Allen*, 393 U.S. at 554. The Court recognized that "[t]he Voting Rights Act does not explicitly grant or deny private parties authorization to seek a declaratory judgment that a State has failed to comply with the provisions of the Act." *Id.* at 554–55 (footnote omitted). Analyzing § 5's provision that "no person shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, § 5]," the Court held "in light of the major purpose of the Act," that private litigants "may seek a declaratory judgment that a new state enactment is governed by § 5." *Id.* at 555. The Court also concluded that "after proving that the State has failed to submit the covered enactment for § 5 approval, the private party has standing to obtain an injunction against further enforcement, pending the State's submission of the legislation pursuant to § 5." *Id.* (footnote omitted).

*Allen* thus limits the types of remedies available to private litigants. *Webber v. White*, 422 F.Supp. 416, 426 (N.D.Tex.1976)

(Mahon, J.) ("[T]he most relief that a federal district court can grant to a private litigant under the *Allen* interpretation of 42 U.S.C. § 1973c is a judicial declaration that the state enactment in question falls under the requirements of the section and an injunction against enforcement of the state enactment until the state has properly submitted it under the Act."); *Olagues v. Russoniello*, 770 F.2d 791, 804–05 (9th Cir.1985) (holding that under *Allen* "private litigants are held to have an action against state officials for declaratory and injunctive relief under section 5 of the Act, 42 U.S.C. § 1973c."), *cert. granted*, 481 U.S. 1012, 107 S.Ct. 1885, 95 L.Ed.2d 493, *and vacated as moot*, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987). Since *Allen* was decided, other forms of relief have been approved, but none has involved a monetary award.

### B

The limited role of a three-judge local district court in the clearance regimen created by the Voting Rights Act demonstrates our lack of authority to grant plaintiffs their lost election fees.

Section 5 provides that two tribunals and the Attorney General play a defined role in the clearance process. State or political subdivisions that are covered by the Act may seek judicial clearance by "institut[ing] an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2)[.]" 42 U.S.C. § 1973c. Covered states and political subdivisions may also seek administrative clearance from the Attorney General. *Id.* A private party may sue in a local district court, composed of three judges, "for declaratory judgment and injunctive relief, claiming that a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny." *Allen*, 393 U.S. at 561.

It is pellucid that the function of the local district court is the narrowest of the three.

In contrast with the District Court for the District of Columbia and the Attorney General, each of whom is empowered to make "the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color,'" *Perkins v. Matthews,* 400 U.S. 379, 385, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), the local district court "lacks authority to consider the discriminatory purpose or nature of the changes." *Lopez,* —— U.S. at ——, 117 S.Ct. at 349 (citing *Perkins,* 400 U.S. at 385). "The only issue [in an action brought by a private litigant] is whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for approval before enforcement." *Allen,* 393 U.S. at 558–59; *Perkins,* 400 U.S. at 383. A three-judge court is authorized only to "determine (i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy was appropriate." *City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983); *see Lopez,* —— U.S. at ——, 117 S.Ct. at 349; *Campos,* 968 F.2d at 451. If the necessary approval was not obtained, the court decides "what temporary remedy, if any, is appropriate." *Lopez,* —— U.S. at ——, 117 S.Ct. at 342. Congress' preference to vest exclusive authority to evaluate the discriminatory effect or purpose of an election change in the Attorney General and the United States District Court for the District of Columbia "necessarily constrains the role of the three-judge district court." *Id.* at ——, 117 S.Ct. at 348.

14. We consider here only decisions in which individuals brought pre-election suits and elections were not enjoined.

In § 5 cases where a court enjoins a change, the issue of remedy is straightforward. A private party files suit, the court determines that there has been an unprecleared change and declares that the change requires preclearance, and the court enjoins implementation of the change and/or directs the state or political subdivision to obtain preclearance. *See Allen,* 393 U.S. at 554–55 (holding that individual parties may sue for declaratory judgment and injunctive relief); *Lopez,* —— U.S. at ——, 117 S.Ct. at 349 ("The goal of a three-judge district court facing a § 5 challenge must be to ensure that the covered jurisdic-

These constraints should be understood not only in terms of the substantive question-coverage question distinction between the United States District Court for the District of Columbia and the Attorney General, on the one hand, and of the local district court, on the other. *See Perkins,* 400 U.S. at 384–85. They also strongly corroborate that any remedy fashioned in a § 5 action must be similarly restrained in order that a tribunal of limited authority not trench on the powers and responsibilities reserved to its counterparts. Given the carefully defined structure of the clearance apparatus, we will not infer implied authority to award relief such as lost election fees absent a clear indication that Congress has vested this power in us.

## C

The decisions that address § 5 remedies are consistent with our interpretation of its scope.[14]

A change that has remained in effect without preclearance is subject to "a remedy that in all circumstances of the case implements the mandate of § 5 in the most equitable and practicable manner with least offense to its provisions." *Clark v. Roemer,* 500 U.S. 646, 660, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991). This is a grant of "limited discretion in fashioning a remedy." *Brooks v. State Bd. of Elections,* 775 F.Supp. 1470, 1482 (S.D.Ga. 1989) (three-judge court) (per curiam), *aff'd mem.,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990), *reconsideration granted in part,* 790 F.Supp. 1156 (S.D.Ga.1990).

■■ It is inconsistent with § 5 to order that a governmental unit conduct elections

tion submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible."); *Heggins v. City of Dallas, Tex.,* 469 F.Supp. 739, 743 (N.D.Tex.1979) (three-judge court) (per curiam) (enjoining city council elections pending preclearance and concluding that Congress and Supreme Court "intended injunctions against elections to be the normal remedy afforded against defendants who attempt to hold elections before obtaining preclearance."). "Once a covered jurisdiction has complied with these preclearance requirements, § 5 provides no further remedy." *Lopez,* —— U.S. at ——, 117 S.Ct. at 348 (citing *Allen,* 393 U.S. at 549–550).

under an unprecleared plan. *Lopez,* —— U.S. at ——, 117 S.Ct. at 347–49. The district court may not interpose itself in the § 5 approval process by directing the parties to submit to it election plans that comply with § 5 before the litigants pursue preclearance from federal officials. *Id.* at ——, 117 S.Ct. at 349. A three-judge court is powerless to decide a question of constitutional law, and must only determine whether the governmental unit should be enjoined from holding elections under an unprecleared plan. *United States v. Board of Supervisors,* 429 U.S. 642, 646, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977) (per curiam); *see Connor v. Waller,* 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (per curiam) (reversing judgment in § 5 case of three-judge court that decided constitutional challenges to state laws).

■ In appropriate circumstances a three-judge district court may set aside an election and order a new one, *Perkins,* 400 U.S. at 396–97 & 397 n. 14; *Coalition to Preserve Houston v. Interim Bd. of Trustees,* 494 F.Supp. 738, 742 (S.D.Tex.1980) (three-judge court) (per curiam), *aff'd,* 450 U.S. 901, 101 S.Ct. 1335, 67 L.Ed.2d 325 (1981); grant local officials an opportunity to seek federal approval of unprecleared changes before ordering a new election or setting aside the results of an election, *Perkins,* 400 U.S. at 396–97; *Berry v. Doles,* 438 U.S. 190, 192–93, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978) (per curiam); *NAACP v. Hampton County Election Commission,* 470 U.S. 166, 182–83, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985); *Brooks,* 775 F.Supp. at 1482, or enjoin further enforcement of unprecleared changes until the state or political subdivision demonstrates compliance with § 5, *Perkins,* 400 U.S. at 397.

Plaintiffs have cited no case, and we have located none, in which a § 5 court has awarded any form of monetary relief (regardless whether characterized as damages or equitable relief).[15] The Act does not specify any statutory damages remedies, and a right to damages should not be implied. *Olagues,*

770 F.2d at 805 (addressing claim for "statutory damages" under the Voting Rights Act).

*Clark* requires that whatever the remedy, it must implement the mandate of § 5. *Clark,* 500 U.S. at 660. This command is properly understood in its context as a component of the entire Voting Rights Act. The Act is intended "to rid the country of racial discrimination in voting." *Allen,* 393 U.S. at 548. Section 5 gives the law steel teeth by "freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory," *see Beer,* 425 U.S. at 140 (quotations omitted), and providing injunctive relief when changes have not been precleared, *see Lopez,* —— U.S. at ——, 117 S.Ct. at 347. There is nothing in the mandate of § 5 to suggest that monetary relief should play any part.

The remedies that we have found in the reported decisions follow a uniform principle: the relief granted must protect the right of minority citizens fully to exercise their right to vote. Whether the remedy takes the form of enjoining an unprecleared change, commanding that clearance be secured, or setting aside an election conducted pursuant to an uncleared change, the relief unflinchingly concerns itself with the right of suffrage, not with some other, less weighty interest.

**D**

Plaintiffs concede that we lack authority to award them damages and that our remedial authority is limited. They urge that, notwithstanding the direct language of *Lopez,* we have authority to grant them back pay for the November 1996 and August 1997 elections, so that they may be placed in the position they would have been in but for the violation of § 5. Plaintiffs rely on the statement in *Perkins* that a three-judge local district court has the power to determine an "appropriate remedy" in a § 5 case. *See Perkins,* 400 U.S. at 396–97. We find this reliance to be misplaced. In *Perkins* the Court made this statement with reference to a three-judge local district court's power to

---

**15.** Plaintiffs assert that the monetary relief they seek is a type of restitution and is appropriately awarded as equitable relief that is consistent with the purpose of § 5. We hold that we lack the authority to make such an award, regardless whether it is characterized as damages or restitution.

order new elections or to enjoin elections pending federal approval of the challenged voting scheme. *Id.* In no way did the Court countenance a claim that a person denied political office by a plan adopted in violation of § 5 can recover monetary relief. Significantly, in *Lopez* the Court pointed to *Perkins* as authority for its holding that a three-judge local district court's power was limited to facilitating the preclearance of the jurisdiction's election plan. *Lopez*, —— U.S. at ——, 117 S.Ct. at 349.

Plaintiffs also appear to attempt to defuse the staggering implications of implying a private right of action for office seekers claiming money damages for a § 5 violation. They highlight the relatively meager sum they seek ($207.00), in comparison to the far-reaching non-monetary remedies that courts undoubtedly can impose (*e.g.,* voiding elections), as evidence that the remedy is within our equitable power to grant. At a superficial level, this argument confuses the *kind* of remedy with the *degree* of the remedy. If a court is powerless to award a particular type of relief, it is immaterial that the remedy would appear as no more than a blip on the public exchequer's radar screen. More fundamentally, plaintiffs ask that we infer authority to award monetary relief. We decline to infer such power, particularly in the sensitive area of adjusting the relationship between the federal and state governments.

Federalism costs that may be justified in some § 5 preclearance contexts may not be justifiable in others. *See Miller,* 515 U.S. at 926–27 (addressing Government policy of maximizing majority-minority districts wherever possible in § 5 preclearance context). Plaintiffs' interpretation of § 5 would allow three-judge local district courts to impose potentially monumental awards against government bodies. They appear to downplay the implications of their argument by asserting that because they were the only individuals who filed pre-election claims that are subject to awards of lost fees, granting them relief would not open the door to claims by other persons who might have been unlawfully removed as presiding judges. Ps. Oct. 20,

1997 Br. at 3 n. 4. Although this assertion is undoubtedly correct in the present case, if a local district court has authority to restore unpaid election fees, on what principled basis could it deny, for example, unpaid salaries and benefits to officials or candidates denied offices that they would have occupied had there been § 5 compliance? This question answers itself.

Accordingly, we conclude that plaintiffs' request for lost election fees is one that we lack authority to grant.

## IV

Defendants recognize that plaintiffs are not precluded from applying for attorney's fees. *See* Ds. Suggestion of Mootness at 4 (citing *Associated Builders & Contractors of La., Inc. v. Orleans Parish Sch. Bd.,* 919 F.2d 374, 377–78 (5th Cir.1990)). A scheduling order for submission of applicable material will be entered separately. *See* 42 U.S.C. § 1973*l* (e) and 1988.[16]

\* \* \*

This action is dismissed in part as moot and in part on the merits by judgment to be filed separately.

**SO ORDERED.**

---

**16.** We express no view as a three-judge court concerning the awardability and amount of attorney's fees. The parties agree that this is a single judge matter.