DeMOSS, Circuit Judge:
The plaintiffs-appellees, B.C. Foreman, Ida Clark, Otis Tarver, Dominic De La Cruz,. Louis Davis, and Mandy Persina (“plaintiffs”), served as precinct election judges in Dallas County, Texas. The plaintiffs subsequently lost those positions when the defendants-appellants, Dallas County, the Commissioners Court of Dallas County, and other (“defendants”), adopted a new method of appointing precinct election judges. The plaintiffs subsequently sued the defendants under § 5 of the Voting Rights Act of 1965 (“VRA”), 42 U.S.C. § 1973 et seq., alleging that the defendants had not precleared the appointment method for precinct judges with the United States Department of Justice as required by statute, 42 U.S.C. § 1973c. After lengthy and protracted litigation, which included an appeal to the United States Supreme Court, Foreman v. Dallas County, Tex., 521 U.S. 979, 117 S.Ct. 2357, 138 L.Ed.2d 972 (1997) (per curiam), the suit was dismissed by a three-judge district court as moot when the Texas legislature eventually enacted a new and different appointment method. In this appeal we are asked to decide whether the district court erred in granting the plaintiffs attorney’s fees as prevailing parties under 42 U.S.C. § 1973l(e). We reverse the district court’s award of attorney’s fees and render judgment that the plaintiffs take no attorney’s fees.
*317 I.
In Texas presiding election judges are assigned to local precincts and are responsible for managing the elections which occur there. See Tex. Elec.Code § 32.071. An election judge’s responsibilities include administering oaths at polling places, preserving order and preventing breaches of the peace, and enforcing the provisions of the Texas Election Code. See Tex. Elec. Code §§ 32.072-.075. The alternate presiding judge serves as presiding judge for an election if the presiding judge is unable to serve. Tex. Elec.Code § 32.001(b); Foreman v. Dallas County, Tex., 990 F.Supp. 505 (N.D.Tex.1998) (outlining various responsibilities of election judges).
In 1996, before this suit was filed, the Texas Election Code required the Dallas County Commissioners Court to appoint on an annual basis presiding and alternate election judges for each precinct. Tex. Elec.Code. § 32.002(a) (repealed 1997). Although the Code required the Commissioners Court to “consider” the recommendations of the County Elections Administrator before making an appointment, the statute vested the Commissioners Court with the discretion to appoint any qualified person. Tex. Elee.Code § 32.002(d) (repealed 1997).
Between November 1, 1972, when Texas became a covered jurisdiction under the Voting Rights Act, and October 1996, when the Commissioners Court adopted the appointment plan at issue, the Commissioners Court adopted various methods for selecting election judges, without first obtaining preclearance from the Department of Justice. See Foreman, 990 F.Supp. at 507 (detailing the chronology of changes). For example, between 1982 and 1995, the Commissioners Court appointed election judges pursuant to a presidential election formula. This formula required the presiding judge to be a member of the party whose presidential candidate carried the precinct in the most recent presidential election. The alternate judge was appointed from the other party. In 1995, however, the Commissioners Court adopted a senatorial method for appointing election judges. This method was based on which party carried a precinct in the most recent senate race. Dallas County, Texas Order No. 95-1313 (1995) (repealed 1996) (hereinafter “1995 Order”).
In September 1996, the Commissioners Court changed its appointment method again. This time, in all precincts where the Republican candidate for Senate received the most votes in the 1994 election, the person submitted or approved by the Republican party would be named the presiding election judge.[1] A majority of the Commissioners Court could vote, however, not to appoint the proposed judge. In all other precincts, the commissioner who represented the precinct determined whether the person submitted or approved by the Republican or Democratic party would be appointed presiding election judge. The person submitted or approved by the party whose candidate was not chosen was named the alternate election judge, subject to the veto of a majority of the Commissioners Court. Dallas County, Texas Order No. 96-1630 (1996) (repealed 1996) (hereinafter “1996 Order”). Because this new methodology gave the individual commissioners influence over the appointment of election judges in precincts where the Republican Senate candidate did not win a majority, the practical effect was more Republican and fewer Democratic presiding judges.
On October 3, 1996, the plaintiffs — black and Hispanic voters who had not been reappointed as election judges — filed suit alleging that the 1996 Order, and its appointment procedure, had not received preclearance as required by § 5 of the Voting Rights Act. The plaintiffs also filed *318 a motion for a temporary restraining order to enjoin the defendants from implementing the 1996 Order.[2] The district court granted the motion and issued a temporary restraining order, and convened a three-judge court as required by the VRA to consider the merits.
A few days later the Commissioners Court rescinded the 1996 Order and, claiming authority from § 32.002 of the Election Code, proceeded to appoint election judges in a purely discretionary manner. The Commissioners Court, which consisted of four Republicans and one Democrat, then appointed only Republicans as presiding election judges, and Democrats as alternate presiding election judges. In addition to clearing the precincts of all presiding election judges from the Democratic party, at least 54 black and 33 Hispanic election judges were not reappointed. Dallas County, Texas Order No. 96-1950 (1996) (repealed 1997) (“October Order”).
The plaintiffs subsequently amended their complaint and sought declaratory and injunctive relief enjoining the Commissioners Court from implementing the October Order for failure to receive preclearance under § 5 of the VRA. The three-judge court denied the request for injunctive relief and allowed the 1996 elections to take place under the supervision of the election judges that had been appointed under the October Order. After the election was over, the three-judge court dismissed the plaintiffs’ suit, holding that § 5 of the VRA did not apply to the Commissioner Court’s procedures for appointing precinct election judges. Because the entire Texas Election Code had been precleared in 1985, the three-judge court reasoned that the Commissioners Court was merely exercising its discretion pursuant to the precleared Election Code.
On appeal, the Supreme Court rejected the holding of the three-judge court and found that the appointment procedures were properly covered by § 5 of the VRA. Foreman v. Dallas County, Tex., 521 U.S. 979, 117 S.Ct. 2357, 2358, 138 L.Ed.2d 972 (1997) (per curiam). The Court noted, however, that the determinative question was whether the county sought to administer a procedure that was different from the one in place on November 1, 1972, the date the VRA went into effect in Texas. Id. at 2358-59. Because the record was silent on the procedures for appointing election judges in 1972, the Supreme Court on June 27, 1997 vacated the three-judge court’s ruling and remanded the case for further findings. Id. at 2359.
However, prior to the Supreme Court’s decision the Texas legislature amended § 32.002 of the Texas Election Code and adopted a gubernatorial method for selecting election judges. See Tex. Elec.Code § 32.002 (1999). The Justice Department precleared the revised statute on September 2, 1997, and on October 7, 1997, the Commissioners Court appointed new election judges in accordance with the new method.[3] On January 8, 1998, the three-judge court dismissed the plaintiffs’ § 5 preclearance claim as moot, leaving open the question of attorney’s fees. On the plaintiffs’ motion, a single district judge found that the plaintiffs were prevailing parties within the meaning of 42 U.S.C. § 1973l(e), and awarded the plaintiffs roughly $183,263 in attorney’s fees. The defendants timely appealed.
II.
We review a district court’s award of attorney’s fees for abuse of discretion and its supporting factual findings for clear error. Wilson v. Mayor of St. Francisville, 135 F.3d 996, 998 (5th Cir.1998). We review the conclusions of law underlying the award of attorney’s fees de *319 novo. Marre v. United States, 117 F.3d 297, 301 (5th Cir.1997) (citing Texas Food Indus. Ass’n v. United States Dept. of Agric., 81 F.3d 578, 580 (5th Cir.1996)).
III.
On appeal the defendants assail the district court’s finding that the plaintiffs qualify as prevailing parties under 42 U.S.C. § 1973l(e).[4] As reflected in its memorandum order, the district court based that determination on two separate grounds. The district court first found that the plaintiffs were prevailing parties because their suit was a “significant catalyst” behind the Texas legislature’s decision to amend § 32.002 of the Election Code and enact a gubernatorial appointment procedure. The court also found that the plaintiffs were prevailing parties because the plaintiffs were successful in obtaining a temporary restraining order. We begin our review of those two findings with a brief look at our guiding principles.
Only “prevailing parties” may recover attorney’s fees under 42 U.S.C. §§ 1973l (e).[5] What it means to “prevail” was recently clarified by the Supreme Court in Farrar v. Hobby, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). There, the Supreme Court explained that a plaintiff prevails “when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant’s behavior in a way that directly benefits the plaintiff.” Id. at 111-12, 113 S.Ct. 566; TK’s Video, Inc. v. Denton County, Texas, 24 F.3d 705, 711 (5th Cir.1994). The Court further observed that “[n]o material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant.” Farrar, 506 U.S. at 113, 113 S.Ct. 566. Thus, “the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant.” Id. at 111, 113 S.Ct. 566. With those standards in mind, we turn to the substantive merits of this appeal.
A.
The first matter we address is the district court’s finding that the plaintiffs are prevailing parties because their suit was a significant “catalyst” behind the Texas legislature’s decision to amend the appointment procedures. On appeal the defendants argue that the district court’s finding is incorrect because prevailing party status can no longer be based on a catalyst theory after the Supreme Court’s decision in Farrar. The defendants further contend that even if the catalyst theory remains good law, it cannot be applied the acts of third parties and, in particular, to the acts of a general legislature.
By bringing this challenge to the district court’s use of the catalyst theory, the defendants have ventured into an unsettled area of the law. Before the Supreme Court’s decision in Farrar, the catalyst theory was routinely applied in this and other circuits. See Heath v. Brown, 858 F.2d 1092, 1094 (5th Cir.1988); Garcia v. Guerra, 744 F.2d 1159, 1162 (5th Cir.1984); Williams v. Leatherbury, 672 F.2d 549, 550-51 (5th Cir.1982). It allowed a plaintiff to achieve prevailing party status— even in the absence of a formal victory in court — -if the plaintiffs suit was a “substantial factor or a significant catalyst” in obtaining the relief sought. See Leather- *320 bury, 672 F.2d at 550-51 (explaining catalyst theory).
After Farrar, however, the continuing validity of the catalyst theory is in serious doubt. In Farrar the Supreme Court seemed to narrow the circumstances in which a party may claim prevailing party status. The Court noted that “to qualify as a prevailing party ... [t]he plaintiff must obtain an enforceable judgment .., or comparable relief through a consent decree or settlement.” Id. at 111, 113 S.Ct. 566 (emphasis added). The Court declared that “[o]nly under these circumstances can civil rights litigation effect ‘the material alteration of the legal relationship of the parties’ and thereby transform the plaintiff into a prevailing party.” Id. (emphasis added). The Court added that “[n]o material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant.” Id. at 113, 113 S.Ct. 566 (emphasis added).
The language in Farrar strongly suggests that a plaintiff must obtain some merits-based relief which alters its legal standing with the defendant before it may claim prevailing party status. That, however, is seemingly at odds with the catalyst theory which allows a plaintiff to claim prevailing party status even if there is no material change in the legal relationship between the parties. See Leatherbury, 672 F.2d at 550 (“Success by judgment may be self-evident, but a party may still ‘prevail’ if its ends are accomplished as a result of the litigation even without formal judicial recognition”). This has led at least one court to conclude that Farrar has swept the catalyst thepry into the judicial trash heap. See S-1 & S-2 v. State Bd. of Educ., 21 F.3d 49, 51 (4th Cir.) (en banc), cert. denied, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994) (expressly overruling the “catalyst” theory and stating that a plaintiff may only qualify as a “prevailing party” by virtue of “having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought”). Other courts have disagreed, finding that their respective versions of the catalyst theory remain viable. See, e.g., Ellis v. University of Kansas Med. Ctr., 163 F.3d 1186 (10th Cir.1998); Brown v. Local 58, Int’l Bd. of Elec. Workers, AFL-CIO, 76 F.3d 762 (6th Cir.1996); Marbley v. Bane, 57 F.3d 224 (2d Cir.1995); Kilgour v. City of Pasadena, 53 F.3d 1007 (9th Cir.1995); Zinn v. Shalala, 35 F.3d 273 (7th Cir.1994).
This Court has never fully explored the impact of Farrar on the catalyst theory. There have been a few cases after Farrar that have continued to apply the catalyst rule. See, e.g., Watkins v. Fordice, 7 F.3d 453, 456 (5th Cir.1993) (acknowledging the catalyst theory without discussing the potential conflict with Farrar ); Pembroke v. Wood County, 981 F.2d 225, 231 n. 27 (5th Cir.1993) (distinguishing Farrar and seeming to limit its holding to suits seeking money damages, but not discussing potential conflict between the catalyst theory and Farrar); Milton v. Shalala, 17 F.3d 812, 814-15 (5th Cir.1994) (acknowledging the catalyst theory without discussing potential conflict with Farrar). And in one opinion we acknowledged the question and observed that the catalyst theory “might” still be good law. Craig v. Gregg County, 988 F.2d 18, 20-21 (5th Cir.1993). But we have never addressed the issue directly. Though the defendants now urge us to engage in that close debate, we decline the invitation. Assuming, without deciding, that the catalyst theory still applies in this Circuit, the facts of this case do not support a finding that the plaintiffs were prevailing parties under 42 U.S.C. § 1973l(e).
We have held that under the catalyst theory a plaintiff may obtain attorney’s fees as a prevailing party only if it establishes (1) that the relief sought by plaintiff was in fact obtained, and (2) that the suit itself caused the defendant to alter its conduct. Pembroke, 981 F.2d at 230. In order to prove the requisite causation, *321 the lawsuit must have been a “a substantial factor or a significant catalyst” in motivating the defendants to alter their behavior. Robinson v. Kimbrough, 652 F.2d 458, 466 (5th Cir.1981). Here, the defendants assert that the plaintiffs do not qualify as prevailing parties because they failed to obtain the relief sought in their suit. The defendants also contend that there is insufficient evidence that the plaintiffs’ action was a substantial factor in the Texas legislature’s decision to adopt the gubernatorial appointment procedure. We agree on each count.
The plaintiffs brought suit under § 5 of the VRA. The gravamen of their complaint is that the defendants adopted the 1996 appointment procedure without preclear-ing it with the Department of Justice, as required by the statute. For relief the plaintiffs requested: (1) a declaration from the district court that the 1996 Order was legally unenforceable; (2) a temporary and permanent injunction against the defendants’ use of any procedure that had not been precleared; (3) a declaration from the district court ordering the defendants to preclear the procedure; and (4) a declaration from the district court ordering that the 1996 election be conducted using a legally enforceable procedure, or, alternatively, the procedure used from 1982 to 1995.
From a cursory reading of the plaintiffs’ complaint it is evident that the plaintiffs filed this action solely to enforce § 5’s preclearance procedures. It is equally apparent that all of the plaintiffs’ requested relief flowed from the rights that accrued under § 5 of the VRA. Thus, when the Texas legislature adopted an entirely different appointment method, mooting the litigation, the plaintiffs went home empty handed. They received none of the substantive relief for which they originally filed suit.
The plaintiffs, however, would have us believe that they successfully obtained relief in the form of the newly-enacted gubernatorial method. They would point to the fact that under that new method they were reappointed to their old positions. Though carrying some initial appeal, their argument fails under close scrutiny.
The plaintiffs’ complaint is filed under the narrow confines of § 5 of the VRA, with the stated intent of forcing the defendants to preclear the 1996 appointment procedure. It may be true that the plaintiffs filed this action with the goal of pressuring the defendants into adopting a different procedure. But hidden motives are not the stuff on which attorney’s fees are based. A defendant cannot be asked to pay attorney’s fees for relief which was never demanded, or even made clear, in the plaintiffs complaint. Similarly, even under the catalyst theory it will be a rare case indeed where a defendant is made to pay attorney’s fees for relief that was secured from an independent third-party who was never a party to the lawsuit.[6] We conclude that the district court clearly erred in finding that the plaintiffs were successful in obtaining the relief sought by filing this action.
Likewise, even if we assume that the plaintiffs did obtain some relief, there is insufficient evidence of a causal connection between the plaintiffs’ individual suit and the Texas legislature’s decision to revamp the appointment procedure. As evidenced by its name, the catalyst theory requires that a plaintiff prove that the suit itself was a catalyst for relief. That is, the plaintiff must prove that the plaintiffs suit was a “substantial factor” in achieving the relief sought. Robinson, 652 F.2d at 466. Critically, a plaintiff does not satisfy that standard with evidence of a causal connection in the most basic sense. Instead, the plaintiff must prove the lawsuit itself, as a discrete event, had a significant and identi *322 fiable influence on the attainment of rebel Considering that the legislative process is fraught with compromises, competing concerns, and unspoken motives, a plaintiff who attempts to prove that his individual suit was the catalyst behind the passage of general legislation faces a formidable task. See Milton v. Shalala, 17 F.3d at 815 (“The mere possibility that Congress acted because of an individual claimant’s suit (or reacted to a large number of similar suits) is too speculative in our view considering the many influences upon members of Congress in casting their votes. We agree with the cases that have refused to credit the change in law to a claimant’s individual law suit and found the nexus between Congress’s action and the law suit too attenuated.”)
In this case, the district court found the necessary level of causation based solely on the affidavits of three Texas legislators filed after the new appointment method was' adopted and after the suit was dismissed. In those affidavits the legislators essentially stated that the Texas legislature decided to enact the new procedure as a result of the plaintiffs’ suit. The district court’s exclusive reliance on those three affidavits was clearly erroneous.
No one legislator, or even a group of three legislators, has sufficient personal knowledge to declare the overall intent of the Texas legislature. See Bread Political Action Comm. v. Federal Elec. Comm., 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982) (expressly refusing to give probative weight to after-the-fact affidavit of amendment sponsor regarding legislative intent); Milton, 17 F.3d at 815. For that we rely on the official legislative record, which is itself often insufficient, unhelpful or confusing. In this case, three post hoc, after-the-fact, affidavits do not, standing alone, prove that the plaintiffs’ suit was a substantial factor in the legislature’s decision. They may show that the plaintiffs’ lawsuit was a factor, to be sure. But they in no way show that it was a “substantial factor.” We are strengthened in that conclusion by the fact that the plaintiffs have pointed to no other evidence in the legislative record which affirmatively shows that the Texas legislature enacted the gubernatorial method in response to the plaintiffs’ suit. Moreover, we find it significant that the Texas legislature began the process of amending the appointment method well before the plaintiffs initiated this action.[7]
Thus, even were we to find that the plaintiffs received the relief they sought, there is insufficient evidence that the plaintiffs’ suit caused the Texas legislature to amend § 32.002 of the Election Code. We find that the district court committed clear error in finding that the plaintiffs’ suit was the catalyst behind that legislative decision. This leaves us with the last remaining issue in this appeal, whether the district court erred in finding that the plaintiffs acquired prevaihng party status by seeking and receiving a temporary restraining order.
B.
In its written order the district court held that “the plaintiffs did prevail with respect to their request for a tempo *323 rary restraining order to enjoin the September 3, 1996, order.” That, however, was the total extent of the district court’s reasoning. On appeal the defendants assert that a temporary restraining order does not make a plaintiff a prevailing party. The defendants assert that it is merely a transitory order that has no affect on the merits of the litigation. We agree.
Farrar is clear. To achieve prevailing party status there must be “actual relief on the merits” which “materially alters the legal relationship between the parties.” Farrar, 506 U.S. at 111, 113 S.Ct. 566. A temporary restraining order is not merits-based relief. Nor is it a final remedy. A temporary restraining order is a “stay put,” equitable remedy that has as its essential purpose the preservation of the status quo while the merits of the cause are explored through litigation. As such, a temporary restraining order cannot constitute the type merit-based relief that affords a plaintiff prevailing party status. The district court committed clear error in reaching a contrary conclusion.
IV.
Although today we do not decide whether the catalyst theory survives Farrar in this Circuit, we hold that even under the catalyst theory the district court clearly erred in finding that the plaintiffs were prevailing parties. Accordingly, as the district court abused its discretion in granting attorney’s fees under 42 U.S.C. § 1973l(e), we reverse and render judgment that plaintiffs take no attorney’s fees.

. The person submitted or approved by the Democratic party would be named alternate presiding election judge.

. The plaintiffs also moved to enjoin the defendants from implementing the previous 1995 Order.

. All six plaintiffs were reappointed as presiding judges.

. Section 19731 (e) provides in relevant part:
In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney’s fee as part of the costs.
42 U.S.C. § 1973l(e).

. Because the phrase "prevailing party” connotes the same ' general meaning under § 19731 (e) and 42 U.S.C. § 1988, cases under both Acts apply the same principles when determining plaintiffs' entitlement to attorney’s fees. See Posada v. Lamb County, 716 F.2d 1066, 1071 (5th Cir.1983).

. We have been able to find no Fifth Circuit case which applies the catalyst theory under such circumstances.

. The defendants correctly point out that an almost identical version of the bill that eventually became revised § 32.002 was introduced in the 1995 legislative session. Compare Tex. H.B. 2241, 74th Leg., R.S. (1995), with Tex. H.B. 331, 75th Leg., R.S. (1997) (introduced version), and Tex. Elec.Code § 32.002 (1999). The 1995 bill passed the Texas House as part of an omnibus election bill, but never passed the Senate. Then, a nearly identical bill was filed in the 1997 session. Tex. H.B. 331, 75th Leg., R.S. (1997) (introduced version). Therefore, the statutory change that the plaintiffs claim to have catalyzed was in fact being considered by the Texas legislature well before the plaintiffs' suit was filed. We note, additionally, that the relief sought by the plaintiffs' suit, i.e., preclearance by the Department of Justice of a change in voting procedures, is entirely separate and distinct from the change contemplated by the legislative acts, i.e., a substantive change in the procedure for selecting precinct judges.